# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Parentage of Scarlett Z.-D.*, 2012 IL App (2d) 120266

---

| | |
|---|---|
| Appellate Court Caption | *In re* PARENTAGE OF SCARLETT Z.-D., a minor (James R.D., Petitioner-Appellant, v. Maria Z., Respondent-Appellee). |
| District & No. | Second District<br>Docket No. 2-12-0266 |
| Filed | August 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Petitioner had no standing under the Illinois Marriage and Dissolution of Marriage Act or the Parentage Act to seek a declaration of parentage and custody of the child adopted in Slovakia by the woman he was engaged to marry, notwithstanding the fact that the three lived together as a family for several years, since they were never married, petitioner did not adopt the child, no steps were taken to obtain recognition in Illinois of the adoption by respondent, and there was no Illinois common law supporting his claims. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 08-F-451; the Hon. Timothy J. McJoynt, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Richard D. Felice, of Law Offices, of Richard D. Felice, P.C., of Wheaton, Camilla B. Taylor and Thomas W. Ude, Jr., both of Lambda Legal Defense & Education Fund, Inc., of Chicago, for appellant.

John Knight, of Roger Baldwin Foundation of ACLU, Inc., and Ari Z. Cohn and Frank M. Dickerson III, both of Mayer Brown LLP, both of Chicago, for *amicus curiae*, American Civil Liberties Union of Illinois.

Hugh S. Balsam and Andy J. Miller, both of Locke Lord LLP, of Chicago, for *amici curiae* Chicago Appleseed Fund for Justice, Family Equality Council, and Family Institute at Northwestern University.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.

Presiding Justice Jorgensen and Justice McLaren concurred in the judgment and opinion.

**OPINION**

¶ 1     Petitioner, James R.D. (Jim), appeals from the trial court's dismissal under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)) of his contract claims and from the court's denial, following trial, of his claims for custody, visitation, and child support. For the following reasons, we affirm.

¶ 2                              BACKGROUND

¶ 3     Jim and respondent, Maria Z. (Maria), began living together as a couple in 1999. They became engaged in 2000 or 2001. In early 2003, Maria went to Slovakia to visit family. While there, she met Scarlett, a 3½-year-old orphan girl. Maria commenced the process of adopting Scarlett under Slovakian law. During the year-long adoption process, Maria lived in Slovakia. Under Slovakian law, Jim was not permitted to adopt Scarlett because he was neither a Slovakian national nor married to Maria, but he was involved in the process and traveled to Slovakia approximately five times during that period. In 2004, Maria returned to the United States with Scarlett, and the parties lived together with Scarlett as a family. The parties never married, and neither took any steps to obtain recognition of the adoption in Illinois. Jim did not adopt Scarlett.

¶ 4     By August 2008, the parties' relationship had deteriorated, and Maria moved out with Scarlett. On August 22, 2008, Jim filed a petition for declaration of parental rights, which the trial court struck on Maria's motion. Jim subsequently filed an "Amended Motion and

-2-

Petition for Adoption," which the trial court allowed him to withdraw. On May 11, 2009, Jim filed the action to establish parentage at issue here. In count I, Jim requested a declaration of parentage and an order granting the parties joint legal and physical custody or, alternatively, granting him primary custody with reasonable visitation for Maria. In count II, Jim sought an equitable division of child support between the parties. Counts III through VI, entitled breach of oral agreement, promissory estoppel, breach of implied contract in fact, and breach of implied contract in law, respectively, each prayed for relief in the form of custody, visitation, and child support determinations.

¶ 5     On May 29, 2009, Maria filed a section 2-615 motion to dismiss, alleging, *inter alia*, that Jim's petition failed to state a cause of action because it did not address the threshold question of Jim's standing under either section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/601(b)(2) (West 2010)) or section 7 of the Illinois Parentage Act of 1984 (750 ILCS 45/7 (West 2008)). Jim filed a response, arguing that a section 2-615 motion was not the proper vehicle to raise the issue of standing and that Maria had, therefore, waived her standing argument. The trial court entered an order allowing Maria to file a memorandum in support of her section 2-615 motion, if she so desired. Within the time allowed for that memorandum, Maria instead filed a section 2-619 (735 ILCS 5/2-619 (West 2010)) motion to dismiss, asserting lack of standing under section 601 of the Dissolution Act, based on the affirmative matter that Scarlett had always been in Maria's physical custody since her adoption. Jim moved to strike Maria's section 2-619 motion.

¶ 6     On August 25, 2009, the trial court heard argument on Jim's motion to strike Maria's section 2-619 motion. In addition to arguing that the motion was untimely, Jim contended that Maria improperly raised the affirmative defense of standing in her section 2-615 motion to dismiss and had, therefore, waived the standing defense. The court began by asking Jim's counsel, "So if I let [Maria's counsel] replead and relabel it [section 2-]619, are we right back where we started?" After hearing the parties' arguments, the court noted that "standing is the linchpin of the attacking motions that were up for hearing." The court reasoned that, "whether it's a 2-615 or a 2-619, I think it's been adequately pled in a timely fashion." The court found that the issue of standing was not a surprise to Jim. The court concluded that "[t]here's been no waiver." The court then offered Jim the option of allowing Maria to refile her section 2-615 motion as a section 2-619 motion so that Jim could supplement his response "with affidavits and the like." Jim's counsel asked if a temporary visitation order could be entered if they chose to replead, and the court said no. Maria's counsel reminded the court that Maria had already filed the section 2-619 motion. Jim then opted to accept the additional time offered to submit affidavits and file a response to Maria's section 2-619 motion, which he did.

¶ 7     On October 7, 2009, the trial court heard argument on both of Maria's motions to dismiss. The court denied Maria's section 2-619 motion in its entirety. With respect to Maria's section 2-615 motion, the court denied the motion as to counts I and II. However, the court granted the motion to dismiss counts III through VI, concluding that there was no common-law cause of action for paternity, that the claims did not meet the elements of contract law, and that the purported contracts "could be void [as] against public policy."

¶ 8        From that portion of the court's October 7, 2009, order denying her section 2-619 motion to dismiss, Maria filed a petition for leave to appeal to this court. We denied the petition as untimely. *In re Parentage of Scarlett Z-D.*, No. 2-09-1280 (2009) (unpublished order under Supreme Court Rule 23).

¶ 9        Thereafter, the case proceeded on counts I and II of Jim's petition. Maria filed her answer to Jim's petition, raising the affirmative defense of standing. The court appointed a guardian *ad litem* (GAL) and ordered the parties to attend mediation. On the GAL's motion, the court ordered that Jim have supervised visitation with Scarlett. Scarlett attended counseling. The court appointed a custody evaluator. Later, the court appointed a visitation facilitator to facilitate visits and make a report of her observations.

¶ 10        Trial commenced on May 10, 2011, spanning 17 days of testimony over 7 months. The parties presented extensive evidence. The witnesses included the parties, Dr. Shapiro (the custody evaluator), Dr. Warren (the visitation facilitator), and Joseph Beck (the GAL), as well as many friends, neighbors, and relatives of the parties. Numerous exhibits were admitted, including Dr. Shapiro's custody evaluation, Dr. Warren's observation notes, family photographs and videos, and Scarlett's school records and art work.

¶ 11        The parties rested their respective cases on December 16, 2011. The court granted Maria's previously filed motion for an *in camera* interview of Scarlett, and conducted the interview that day. On January 23, 2012, the parties submitted written closing arguments. On February 9, 2012, the court granted Maria's motion to supplement her closing argument with the February 2, 2012, decision in *In re Marriage of Mancine*, 2012 IL App (1st) 111138, *pet. for leave to appeal pending*, No. 113978 (filed Mar. 8, 2012).

¶ 12        The trial court entered its written opinion and order on February 29, 2012. The court found that "for a long time during and after the adoption of [Scarlett], Jim and Maria lived together with the child as an intact family unit as if they were bound legally." The court found that Jim and Maria planned and participated in the adoption together and that Jim paid for it all and supported Maria during the process. The court found that Jim never adopted Scarlett but that the parties had discussed it. The court stated, "The reasons for these inactions are basically unknown except for the 'falling out' Jim and Maria had some time later." The court found that, for four years or more, Scarlett lived with Jim, called him "daddy," and looked to him as a father figure. The court concluded that Jim was "a fit and proper person" to have visitation or custody. The court found that, after Maria separated from Jim and took Scarlett with her, Scarlett "expressed a desire to continue to see Jim[,] and Maria prevented and blocked such contact." The court believed that the GAL's request for visitation early in the case reflected Scarlett's desires at that time. The court found "considerable evidence that taking Jim out of [Scarlett's] life in 2008 was not good for [her]." The court noted that Dr. Warren, who had observed over 50 visits between Jim and Scarlett, and Dr. Shapiro, who had evaluated Scarlett, both concluded that Jim and Scarlett shared a bond and that Maria had alienated Scarlett from Jim. The court stated that it disregarded the *in camera* interview with Scarlett because it "became immediately obvious to the court that the child was committed to telling the court that she no longer want[ed] to see Jim." The court concluded that Scarlett had been "coached" and "corrupted" and that these were not "her true thoughts." The court said, "[I]t is obvious that the court is unhappy

-4-

with Maria's conduct in this case and is quite sympathetic to Jim's position. And more importantly, the court is very concerned that finding against Jim will take him out of [Scarlett's] life and that this will be bad for [her] and not in her best interests."

¶ 13 Still, the court noted that it was "bound to follow the law as it exists now" and that, despite its concerns regarding best interests, it could not, under current law, reach that issue without first finding that Jim had standing. The court observed that "the standing issue never really changed in the trial." The court found that "Maria correctly argue[d] she is the sole parent and Jim has no statutory legal standing." The court also noted Maria's constitutional right to parent "the way she chooses–good or bad," but expressed concern about Scarlett's right "to have a decent life." The court remarked that "these situations *** need legislation badly" but that it was "without authority to invent new common[-]law theories or somehow create judicial legislation." The court concluded that, especially under *Mancine*, it had no basis to find that Jim had standing. The court denied counts I and II of Jim's petition and vacated all of its prior orders regarding visitation and counseling.

¶ 14 Also on February 29, 2012, the trial court denied Jim's oral motion for a stay of that portion of its order vacating all prior visitation and counseling orders. Jim timely appealed from the court's denial of his petition. He subsequently filed an emergency motion in this court pursuant to Illinois Supreme Court Rule 305(d) (eff. July 1, 2004), seeking to stay the trial court's order vacating its previous orders for visitation and counseling, which we granted.

¶ 15 Thereafter, we granted leave to the American Civil Liberties Union of Illinois and, jointly, to the Family Institute at Northwestern University, the Chicago Appleseed Fund for Justice, and the Family Equality Council, to file briefs *amici curiae* in support of Jim.


¶ 16                                          ANALYSIS

¶ 17 Jim initially argues that the trial court erred in denying count I of his petition, seeking custody, because (1) Maria waived the issue of standing by failing to file a timely section 2-619 motion, (2) Maria was equitably estopped from challenging Jim's standing, because of her conduct in holding him out to be Scarlett's father, and (3) he has common-law standing.

¶ 18 We determine that Maria did not waive the issue of standing. Section 601(b) of the Dissolution Act provides that a custody proceeding may be commenced by a parent (750 ILCS 5/601(b)(1) (West 2010)) or "by a person other than a parent *** but only if [the child] is not in the physical custody of one of his parents" (750 ILCS 5/601(b)(2) (West 2010)). Our supreme court has interpreted section 601(b)(2) as a standing requirement. *In re R.L.S.*, 218 Ill. 2d 428, 434-35 (2006). Section 2 of the Parentage Act of 1984[1] provides that a " 'parent and child relationship' means the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties, and obligations." 750 ILCS 45/2 (West 2010). In the context of a nonparent seeking custody under section 601(b)(2) of the Dissolution Act, standing is a threshold issue that the trial

---

[1]The Dissolution Act does not define the term "parent."

court must decide before proceeding to a best-interests determination. *Mancine*, 2012 IL App (1st) 111138, ¶ 17; see also *R.L.S.*, 218 Ill. 2d at 436 (holding that section 11-5(b) of the Probate Act of 1975 (755 ILCS 5/11-5(b) (West 2004)) imposes a standing requirement that nonparents must meet before proceeding on the merits of a petition for guardianship).

¶ 19 Under section 2-615, a complaint may be dismissed for failure to state a cause of action because of factual or legal insufficiency. *Cummings v. City of Waterloo*, 289 Ill. App. 3d 474, 478 (1997). "A motion to dismiss pursuant to section 2-619 admits the legal sufficiency of a complaint, but asserts affirmative matters that avoid or defeat the allegations contained in the complaint." *Corcoran-Hakala v. Dowd*, 362 Ill. App. 3d 523, 525 (2005). Here, Maria alleged in her section 2-615 motion that Jim's petition did not state a cause of action because it failed to address the threshold issue of standing under either the Dissolution Act or the Parentage Act of 1984. We cannot say that it was improper to raise the standing issue in a section 2-615 motion,[2] because the issue was raised as a factual insufficiency on the face of the petition, namely, that Jim failed to allege any facts that would have brought him within the purview of either the Dissolution Act or the Parentage Act of 1984. See *Cummings*, 289 Ill. App. 3d at 479 ("[A] factually insufficient complaint fails to allege sufficient facts essential to the cause of action."). That Maria subsequently raised lack of standing, based on the affirmative matter that Scarlett was in Maria's physical custody, in a section 2-619 motion, although arguably untimely and filed without leave, does not change the fact that the issue of standing had already been raised. We agree with the trial court that standing was the "linchpin" of both motions to dismiss and that "[t]here's been no waiver." We note that Jim does not, indeed cannot, argue that he was prejudiced, because, as the trial court pointed out, the issue of standing was clearly at issue and not a surprise. Accordingly, Jim's waiver argument has no merit. See *In re Custody of McCarthy*, 157 Ill. App. 3d 377, 380-81 (1987) (holding that, where there was no prejudice, the trial court did not abuse its discretion in allowing a tardy motion to dismiss based on a defense not raised in the answer).

¶ 20 Before addressing Jim's equitable estoppel argument, we examine his central argument that he had common-law standing to bring his custody claim. As stated above, the standing requirement that a nonparent may petition for custody only if the child is not in the physical custody of a parent is a threshold issue that the trial court must decide before proceeding to a best-interests determination. In enacting this standing requirement, our legislature incorporated the superior rights doctrine into the Dissolution Act. *Mancine*, 2012 IL App (1st) 111138, ¶ 15; see also *R.L.S.*, 218 Ill. 2d at 434 (observing that the superior rights

---

[2]We are aware of cases holding that lack of standing under section 601(b)(2) is an affirmative defense that is waived if not raised in a timely section 2-619 motion to dismiss. See, *e.g.*, *In re K.P.L.*, 304 Ill. App. 3d 481, 487 (1999). However, we are convinced that, under the circumstances presented here, Maria could properly raise standing in a section 2-615 motion. In any event, the trial court had discretion to allow Maria's tardy section 2-619 motion because it did not prejudice Jim.

doctrine is incorporated into both the Dissolution Act and the Probate Act[3]). The superior rights doctrine recognizes parents' interest in the care, custody, and control of their children, which is " 'perhaps the oldest of the fundamental liberty interests.' " *R.L.S.*, 218 Ill. 2d at 438 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); see also *Mancine*, 2012 IL App (1st) 111138, ¶ 15 (stating that the "superior rights doctrine *** holds that parents have the superior right to care, custody, and control of their children"). Fit parents enjoy a presumption that they act in the best interests of their children. *R.L.S.*, 218 Ill. 2d at 439 (citing *Troxel*, 530 U.S. at 68). "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69 (holding a Washington grandparent visitation statute unconstitutional as applied because it allowed the petitioners to proceed straight to a best-interests analysis without any deference accorded to the parent's decision to limit grandparent visitation).

¶ 21    Generally, we review *de novo* a trial court's determination on standing. *In re Guardianship of K.R.J.*, 405 Ill. App. 3d 527, 535 (2010). Although the trial court heard extensive evidence and made factual findings, which we would review under the manifest-weight-of-the-evidence standard (*K.R.J.*, 405 Ill. App. 3d at 535), the parties do not challenge the court's factual findings. The standing issue presented here is purely a question of law, which we review *de novo*. See *In re Avery S.*, 2012 IL App (5th) 100565, ¶ 13.

¶ 22    Jim does not dispute the trial court's conclusion that he lacks statutory standing. Because he is not Scarlett's biological or adoptive father, Jim does not meet the definition of a parent under section 2 of the Parentage Act of 1984. Neither does Jim meet the standing requirement of section 601(b)(2) of the Dissolution Act, since Scarlett has always been in Maria's physical custody. Rather, Jim contends that he has common-law standing based on his parent-child relationship with Scarlett, whether he is characterized as an equitable parent, a *de facto* parent, or a psychological parent, or under the doctrine of *in loco parentis*. He urges us to decline to follow the First District "trilogy" of *In re Visitation With C.B.L.*, 309 Ill. App. 3d 888 (1999), *In re Marriage of Simmons*, 355 Ill. App. 3d 942 (2005), and *Mancine*, 2012 IL App (1st) 111138, because the cases were wrongly decided and conflict with our supreme court's precedent as well as "the vast majority of precedent" from our appellate court.

¶ 23    *C.B.L.* involved a lesbian relationship during which one partner bore a child as a result of artificial insemination. The nonparent was involved in the child's birth and in caring for the child for 1½ years, until the parties separated. *C.B.L.*, 309 Ill. App. 3d at 889. The nonparent filed suit, seeking visitation and claiming standing as a *de facto* parent or under the doctrine of *in loco parentis*. *C.B.L.*, 309 Ill. App. 3d at 889-90. The trial court dismissed

---

[3]Section 11-5(b) of the Probate Act grants standing to a nonparent to petition for guardianship if the petitioner shows that the child does not have a parent who is "willing and able to make and carry out day-to-day child care decisions concerning the minor." 755 ILCS 5/11-5(b) (West 2010); *R.L.S.*, 218 Ill. 2d at 435.

the suit for lack of standing, and the appellate court affirmed. *C.B.L.*, 309 Ill. App. 3d at 889. The appellate court held that standing to seek visitation is found only in the Dissolution Act and that the nonparent's claims of common-law standing were therefore without merit. *C.B.L.*, 309 Ill. App. 3d at 894.

¶ 24    Several years later, in *Simmons*, the First District extended its holding in *C.B.L.* to apply to standing to seek custody. In *Simmons*, the parties "participated in a wedding ceremony," and the wife gave birth following artificial insemination. *Simmons*, 355 Ill. App. 3d at 945. The husband, however, was a transsexual male who had been born a female. *Simmons*, 355 Ill. App. 3d at 945-46. The husband filed for dissolution of marriage and sought custody of the child. The wife argued that the husband lacked standing because the same-sex marriage was invalid under Illinois law and he was not the biological or adoptive father. The trial court declared the marriage void *ab initio*, denied the dissolution petition, and granted sole custody to the wife.[4] *Simmons*, 355 Ill. App. 3d at 946. On appeal, the husband argued, *inter alia*, that he had standing as an equitable or *de facto* parent. *Simmons*, 355 Ill. App. 3d at 946-47. The court relied on *C.B.L.* to hold that standing to seek custody is found only in the Dissolution Act, the Parentage Act of 1984, or the Illinois Parentage Act[5] (750 ILCS 40/1 *et seq.* (West 2010)). *Simmons*, 355 Ill. App. 3d at 953-54.

¶ 25    Relying on *Simmons*, this year, the First District, in *Mancine*, affirmed the trial court's dismissal under section 2-619 of a husband's petition for custody for lack of standing. In *Mancine*, the adoptive mother of a child, W., became engaged to a man while she was in the process of adopting as a single parent. *Mancine*, 2012 IL App (1st) 111138, ¶ 3. The parties intended that the husband would adopt W. as a stepparent. *Mancine*, 2012 IL App (1st) 111138, ¶ 5. The parties married two months after the wife's adoption was completed, and the husband began, but never completed, the process of adopting W. *Mancine*, 2012 IL App (1st) 111138, ¶¶ 5-6. The parties subsequently adopted a child, H., together. *Mancine*, 2012 IL App (1st) 111138, ¶ 6. About 16 months into the marriage, the wife filed a petition for dissolution, in which she alleged that the parties had only one child, H. The husband filed a counterpetition seeking custody of W. The wife filed a motion to dismiss, challenging the husband's standing, which the trial court granted. *Mancine*, 2012 IL App (1st) 111138, ¶ 9.

¶ 26    On appeal, the husband contended, *inter alia*, that he had standing as W.'s equitable parent since he had been the child's primary caretaker. *Mancine*, 2012 IL App (1st) 111138, ¶ 12. The court noted that Illinois has not recognized the equitable parent doctrine. *Mancine*, 2012 IL App (1st) 111138, ¶ 15 (citing *In re A.K.*, 250 Ill. App. 3d 981, 986 (1993) (stating that "the theory of making a man who is not the biological father of a child an 'equitable parent' under certain appealing circumstances has never been recognized in Illinois")). Citing *Simmons*, the court stated that "standing to seek full care and custody of a minor child is found solely within" the Dissolution Act, the Parentage Act of 1984, or the Illinois Parentage Act. *Mancine*, 2012 IL App (1st) 111138, ¶ 16. The court stated that the husband did not

---

[4]The court granted visitation rights to the husband. The wife did not contest the visitation order, and the appellate court did not address the issue. *Simmons*, 355 Ill. App. 3d at 946.

[5]This act applies only to children born as a result of artificial insemination.

qualify as a parent under section 2 of the Parentage Act of 1984 because he was neither the biological nor the adoptive parent. *Mancine*, 2012 IL App (1st) 111138, ¶ 16. The court further concluded that the husband lacked statutory standing as a nonparent under section 601(b)(2) of the Dissolution Act because the child was in the physical custody of his only legal parent–the wife. *Mancine*, 2012 IL App (1st) 111138, ¶¶ 17-18.

¶ 27       We agree with the reasoning and the holding of *Mancine*. Under *Mancine*, Jim lacks both statutory standing on the facts and common-law standing because the equitable parent doctrine is not recognized in Illinois. Jim acknowledges his lack of standing under *Mancine*, but he urges that *Mancine* was wrongly decided because the Dissolution Act and the Parentage Act of 1984 did not supplant the common law and standing is not found solely in the statutes. Therefore, according to Jim, he has common-law standing to seek custody. In support of his position that the statutes did not supplant the common law, Jim relies on *In re Parentage of M.J.*, 203 Ill. 2d 526 (2003).

¶ 28       In *M.J.*, the trial court dismissed a biological mother's complaint seeking child support from the man who was her former paramour. *M.J.*, 203 Ill. 2d at 529. The mother alleged that he had orally consented to her being artificially inseminated and had agreed to support the twins born as a result. *M.J.*, 203 Ill. 2d at 530-31. Upon discovering that the man was married, the mother filed suit to establish paternity and to impose a support obligation, seeking relief under both the common law and under the Illinois Parentage Act (750 ILCS 40/1 *et seq.* (West 2010)). *M.J.*, 203 Ill. 2d at 531. The appellate court affirmed, but the supreme court reversed as to the common-law claims. *M.J.*, 203 Ill. 2d at 529.

¶ 29       The supreme court first noted Illinois's strong public policy "recognizing the right of every child to the physical, mental, emotional, and monetary support of his or her parents." *M.J.*, 203 Ill. 2d at 539. The court observed that the Illinois Parentage Act, pertaining solely to children born as a result of artificial insemination, contained only three sections and included no language indicating an intent to prohibit common-law actions for child support. *M.J.*, 203 Ill. 2d at 539-40. The court also noted that "statutes and case law do not equivocate in imposing child support obligations for other children born out of wedlock." *M.J.*, 203 Ill. 2d at 541. Based on this reasoning, the court held that the Illinois Parentage Act did not preclude the mother's common-law claims for child support. *M.J.*, 203 Ill. 2d at 541. The court concluded, "Our holding is limited to the unique circumstances of this case." *M.J.*, 203 Ill. 2d at 542; see *Simmons*, 355 Ill. App. 3d at 952-53 (stating that, although *M.J.* stood for the proposition that a child support action could be brought under the common-law theories of breach of contract and promissory estoppel, it did not support the proposition that a custody action could be brought under the common law).

¶ 30       We note that our supreme court expressly limited its holding in *M.J.* to the "unique circumstances" presented there, including the purported father's financial support of twins born to his paramour as a result of artificial insemination to which he allegedly consented. See *M.J.*, 203 Ill. 2d at 530-31. We also note that the court in *M.J.* addressed common-law claims only for child support, not a common-law claim for custody as in the present case. Moreover, there is a vast difference between the limited scope of the Illinois Parentage Act, pertaining only to children born as a result of artificial insemination (see *M.J.*, 203 Ill. 2d at 539 ("In considering the reach of the Illinois Parentage Act, we note that the statute contains

only three sections ***.")), and the wide scope of the Dissolution Act, addressing custody and visitation rights of both parents and nonparents. In the Dissolution Act, our legislature created a comprehensive scheme addressing the rights of nonparents to seek both custody and visitation, thereby evincing its intent to preclude common-law actions for custody or visitation. See *C.B.L.*, 309 Ill. App. 3d at 891 (noting that legislative intent to supplant the common law can be shown through enactment of detailed and comprehensive legislation).

¶ 31    The Illinois Parentage Act took effect in 1984 and was amended only once, merely to change its short title (Pub. Act 86-1475, art. 4, § 4-26 (eff. Jan. 10, 1991)). On the other hand, the Dissolution Act took effect in 1977 and has been amended numerous times since then. In particular, section 601 was amended to allow a stepparent to petition for custody under certain circumstances (Pub. Act 90-782, § 5 (eff. Aug. 14, 1998)), and to allow, upon the death of one parent, a grandparent to petition for custody under certain circumstances (Pub. Act 93-1026, § 5 (eff. Jan. 1, 2005)). Section 607, providing for visitation rights, has been amended numerous times. In *Wickham v. Byrne*, 199 Ill. 2d 309 (2002), our supreme court held that the grandparent-visitation provisions in sections 607(b)(1) and 607(b)(3) (750 ILCS 5/607(b)(1), (b)(3) (West 2000)) were unconstitutional under *Troxel*. *Wickham*, 199 Ill. 2d at 320-21. The legislature subsequently amended the unconstitutional provisions, adding conditions to grandparent visitation and establishing a rebuttable presumption that a fit parent's visitation decisions are not harmful to the child's mental, physical, or emotional health. Pub. Act 93-911, § 5 (eff. Jan. 1, 2005). In *In re Marriage of Engelkens*, 354 Ill. App. 3d 790 (2004), the court held that the stepparent-visitation provision in section 607(b)(1.5) (750 ILCS 5/607(b)(1.5) (West 2002)) was unconstitutional under *Troxel*. *Engelkens*, 354 Ill. App. 3d at 794-95. Given our legislature's creation of a complex, detailed, and evolving scheme of custody and visitation in response to the increase of nontraditional families in Illinois, we conclude that the legislature intended to supplant the common law of custody and visitation in Illinois. See *In re Marriage of Sullivan*, 342 Ill. App. 3d 560, 564 (2003) ("The effect of the Dissolution Act was to supersede and replace the common law with regard to the subject matter it addressed."); *C.B.L.*, 309 Ill. App. 3d at 891 (holding that section 607 had supplanted the common law of visitation in Illinois because the statute had "evolved from a simple, straightforward codification of the common law of parental visitation to a complex and ever-growing statutory provision").

¶ 32    Moreover, even assuming that the legislature did not intend to supplant the common law, Jim has cited no Illinois case on point that would give him common-law standing to pursue his custody claim. Jim's reliance on *Koelle v. Zwiren*, 284 Ill. App. 3d 778 (1996), is not persuasive. In *Koelle*, the biological mother lied to the nonparent (to whom she was a maternal figure, as she had lived with the nonparent's father in a romantic relationship during the nonparent's adolescence), telling him that he was her child's biological father. *Koelle*, 284 Ill. App. 3d at 780-81. In reliance on that statement, and on the fact that the nonparent had had a sexual encounter with the mother when he was 21 years old, the nonparent acted as the child's father for 8 years by babysitting for her, attending parent-teacher conferences, and taking the child on recreational outings, even a family vacation with the mother. *Koelle*, 284 Ill. App. 3d at 781-82. Ultimately, paternity testing was done, and, when the nonparent discovered that he was not the child's father, he filed a complaint alleging various tort claims

and an equitable claim in which he sought injunctive relief in the form of visitation privileges. *Koelle*, 284 Ill. App. 3d at 782. Following the trial court's dismissal of his complaint, the nonparent appealed. *Koelle*, 284 Ill. App. 3d at 783.

¶ 33    The appellate court reversed the dismissal of the equitable claim and remanded with directions to the trial court to grant visitation privileges if it would be in the child's best interests. *Koelle*, 284 Ill. App. 3d at 786. Recognizing that neither the Dissolution Act nor the Parentage Act of 1984 provided grounds for the nonparent's visitation claim, the court stated that "Illinois case law and general principles of equity support[ed] the claim." *Koelle*, 284 Ill. App. 3d at 784. Relying on *In re Townsend*, 86 Ill. 2d 502 (1981), the court stated that "awarding custody or visitation rights to a nonparent over the objection of a natural parent is permissible if it would be in the best interests of the child." *Koelle*, 284 Ill. App. 3d at 784.

¶ 34    We have serious doubts that *Koelle*, decided before *Troxel*, would survive scrutiny under a *Troxel* analysis, because it placed a nonparent on equal footing with a parent and completely bypassed the superior rights doctrine and its presumption in favor of a fit parent. See *Wickham*, 199 Ill. 2d at 320 (holding that previous version of Illinois's grandparent-visitation statute was unconstitutional under *Troxel* because it put a nonparent on equal footing with a parent in contravention of the presumption that fit parents act in the best interests of their children). And, in fact, in *R.L.S.*, our supreme court abrogated *Townsend* and a line of pre-*Troxel* cases that incorrectly held that a fit parent's custody rights are subservient to the child's best interests, and that held that, under the Probate Act, fit parents are entitled to custody. *R.L.S.*, 218 Ill. 2d at 444, 447-48 (holding that to construe the Probate Act otherwise would run afoul of *Troxel*).

¶ 35    Jim's reliance on *In re Ashley K.*, 212 Ill. App. 3d 849 (1991), is also unavailing. In *Ashley K.*, the child was taken into protective custody within a week of her birth to drug-addicted parents and subsequently adjudicated a neglected and dependent minor. *Ashley K.*, 212 Ill. App. 3d at 852-53. For the next five years, Ashley lived with her foster parents, who wanted to adopt her. *Ashley K.*, 212 Ill. App. 3d at 851-52, 854. Due to the trial court's "total ignorance or total disregard of the Federal law," Ashley was "caught in the quagmire of the bureaucratic maze," never receiving the dispositional hearing to which she was entitled within 18 months of her placement. *Ashley K.*, 212 Ill. App. 3d at 873. The trial court ultimately granted the biological parents' petition to transfer custody back to them, notwithstanding the fact that Ashley had never lived with them and had never even spent a whole week with them during her entire lifetime. *Ashley K.*, 212 Ill. App. 3d at 874. The court's order precluded visitation between Ashley and her foster parents. *Ashley K.*, 212 Ill. App. 3d at 851-52.

¶ 36    The appellate court reversed the custody judgment, ordered that there be visitation with the foster parents, and remanded the case for a new hearing on the biological parents' custody petition, based on the child's best interests. *Ashley K.*, 212 Ill. App. 3d at 890-91. Although the court referred to the foster parents as Ashley's *de facto* parents (*Ashley K.*, 212 Ill. App. 3d at 874), the court was not called upon to address the issue of a nonparent's standing. Rather, the case involved the biological parents' petition to regain custody of their child, who had been adjudicated a neglected and dependent minor, after she had lived for five

-11-

years with her foster parents in a stable home (*Ashley K.*, 212 Ill. App. 3d at 874). Not only were the legal issues different from those in the present case, but also the egregious facts of *Ashley K.* are clearly distinguishable. There, the biological parents' fitness was questioned, not only as to Ashley but also as to two of their other biological children. See *Ashley K.*, 212 Ill. App. 3d at 855-56. Here, since her adoption Scarlett has never lived apart from Maria, and Maria's fitness has never been at issue.[6]

¶ 37　The remaining cases Jim cites in support of his argument that he has common-law standing are also inapposite. See, *e.g.*, *Hawkins v. Hawkins*, 102 Ill. App. 3d 1037, 1039 (1981) (recognizing that a common-law tradition of allowing grandparent visitation was not supplanted by an early version of the Dissolution Act that did not provide for any nonparent visitation); *Cebrzynski v. Cebrzynski*, 63 Ill. App. 3d 66, 67, 73 (1978) (affirming trial court's grant of physical custody to stepmother with visitation to the biological mother where the stepmother had had actual physical custody of the children for over three years and looking at the Probate Act); *Look v. Look*, 21 Ill. App. 3d 454, 456-57, 459 (1974) (affirming the trial court's order granting custody to the grandparents instead of the biological father where the child had lived with the grandparents for five years).

¶ 38　Jim further maintains that he has common-law standing based on the doctrine of *parens patriae*. Jim asserts that under this doctrine courts have inherent authority to exercise jurisdiction over children, independent of statute. The doctrine of *parens patriae* recognizes the "general power and obligation of the government as a whole to protect minors and the infirm" from neglect, abuse, and fraud. (Internal quotation marks omitted.) *Mancine*, 2012 IL App (1st) 111138, ¶ 36. The power was expressly incorporated into section 601(a) of the Dissolution Act (750 ILCS 5/601(a) (West 2010)). *Mancine*, 2012 IL App (1st) 111138, ¶ 37. However, this "emergency" power "is considered extraordinary and is not intended as the basis of jurisdiction for general custody disputes between parents and others." (Internal quotation marks omitted.) *Mancine*, 2012 IL App (1st) 111138, ¶ 37. The court in *Mancine* rejected the husband's *parens patriae* argument. *Mancine*, 2012 IL App (1st) 111138, ¶¶ 36-37. Given that the facts in *Mancine* did not warrant the court's use of its *parens patriae* power, we cannot say that the power is warranted here, where Jim has not even alleged that Scarlett is subject to neglect or abuse. The cases cited by Jim do not convince us otherwise. See, *e.g.*, *People ex rel. Lehman v. Lehman*, 34 Ill. 2d 286, 287 (1966) (addressing proper venue as between two different counties); *People ex rel. Vallera v. Rivera*, 39 Ill. App. 3d 775, 777 (1976) (reversing the trial court's denial of the putative father's visitation petition (pending the mother's paternity suit where the father admitted paternity) and remanding for a hearing on best interests of the child).

¶ 39　Nor can we conclude under existing law that Maria should have been equitably estopped from challenging Jim's standing. Jim maintains that equitable estoppel applies because Maria

---

[6]We are aware of the order of protection obtained by Jim *ex parte* in 2007, based on an incident wherein Maria allegedly slapped Scarlett on the back of the head for disobedience. However, two weeks later, the order of protection was dismissed by agreement. Moreover, the trial court found, and neither party disputes, that, although Maria and Jim had different parenting styles, with Maria being stricter, both were good parents.

actively encouraged Jim and Scarlett to form a father-child relationship and held them out to the world as such. We review under the manifest-weight-of-the-evidence standard the trial court's determination that equitable estoppel did not apply. *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33.

¶ 40 Initially we note that, in *Mancine*, the court rejected the same argument under similar facts. The court in *Mancine* listed the factors necessary to prove equitable estoppel:

" '(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.' " *Mancine*, 2012 IL App (1st) 111138, ¶ 26 (quoting *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313-14 (2001)).

The court reasoned that "[e]quitable estoppel is available only if a party has relied upon another party's misrepresentation or concealment of a material fact." *Mancine*, 2012 IL App (1st) 111138, ¶ 27 (citing *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 492 (1997)). Because the husband in *Mancine* "knew at all times that he was not the biological father of [the child] and that formal adoption was necessary" (*Mancine*, 2012 IL App (1st) 111138, ¶ 27), and because the wife "did not misrepresent the material fact that [the husband] would have to undergo the formal adoption process in order to be [the child's] legal parent" (*Mancine*, 2012 IL App (1st) 111138, ¶ 28), the court held that the doctrine of equitable estoppel was not available (*Mancine*, 2012 IL App (1st) 111138, ¶ 29).

¶ 41 As in *Mancine*, Jim was aware at all times that he was not Scarlett's biological father, that the Slovakian adoption did not pertain to him, and that formal adoption in Illinois would be necessary. Jim testified that it was the parties' intent that both of them would pursue adoption of Scarlett in this country. He said that he had initiated discussions with Maria about adoption every three to six months through 2006. Jim testified that Maria's response was always positive but that she did not act upon his requests. He testified that, when he told Maria that he had found an attorney to handle the adoption, Maria responded that she was busy and that she wanted a Slovakian attorney. Jim also testified that, in 2007, shortly before Maria and Scarlett were scheduled to visit Slovakia, he had asked Maria to sign a document designating him as Scarlett's short-term guardian. He testified that he was concerned that, "if something happened overseas," he would "still be able to see Scarlett and that Scarlett would be raised" in the United States. Jim further testified that in 2008 and 2009 he had investigated his rights as to Scarlett under Slovakian law and even talked to an attorney in Slovakia. He never filed anything in Slovakia. When asked what, if anything, he had done to secure United States citizenship for Scarlett, Jim replied that he himself could not do anything. He stated, "All I can do is work through Maria." By his own testimony, Jim was clearly aware that he had no legal parent-child relationship with Scarlett. Maria made no misrepresentations of fact as to Jim's legal status in relation to Scarlett.

-13-

¶ 42 We note Jim's argument in his reply brief that, whereas *Mancine* involved a child barely two years old, the instant case "presents much stronger factual support for equity to step in" because Scarlett was with Jim longer and had already suffered abandonment as an orphan in Slovakia. We are quite aware of the distinguishing facts pointed out by Jim and are not at all indifferent to Scarlett's situation; nonetheless, we must act within the bounds of the law as it exists.

¶ 43 In support of his equitable estoppel argument, Jim relies on *In re Marriage of Schlam*, 271 Ill. App. 3d 788 (1995). In *Schlam*, the biological mother of a child married a man when the child was about six years old. Although the husband was not the child's biological father, the wife represented him as such and even gave the child the husband's surname. The husband formed a close relationship with the child and assumed financial responsibility for her. The husband filed for divorce about six years later, and the parties entered into a joint parenting agreement, which the trial court incorporated into the judgment of dissolution. *Schlam*, 271 Ill. App. 3d at 791. For about two years thereafter, the husband provided financially for the child and exercised his joint custody rights. *Schlam*, 271 Ill. App. 3d at 791-92. After a dispute between the parties, the husband filed a petition for a rule to show cause, alleging that the wife was violating his rights under the joint parenting agreement, and the wife responded with a petition to declare the agreement void *ab initio*. The trial court granted the wife's petition, and the husband appealed. *Schlam*, 271 Ill. App. 3d at 790.

¶ 44 The appellate court reversed, holding that the wife was equitably estopped from challenging the joint parenting agreement. *Schlam*, 271 Ill. App. 3d at 794-95. The court defined equitable estoppel as arising " 'when a party, by his words or conduct, intentionally or through culpable negligence, induces reasonable reliance by another on his representations and thus leads the other, as a result of that reliance, to change his position to his detriment.' " *Schlam*, 271 Ill. App. 3d at 794 (quoting *Zink v. Maple Investment & Development Corp.*, 247 Ill. App. 3d 1032, 1039 (1993)). The court noted that the purpose of equitable estoppel is to "prevent fraud and injustice." *Schlam*, 271 Ill. App. 3d at 794. The court applied estoppel to the wife because, in reliance on the wife's intentional representation to the trial court that the husband would remain a part of the child's life, the husband obligated himself to pay child support, provide health insurance, and have the child reside with him one-half of each week. *Schlam*, 271 Ill. App. 3d at 794.

¶ 45 *Schlam* is inapposite. The court in *Schlam* did not apply the doctrine of equitable estoppel to preclude the wife from challenging standing; rather, the court held that the wife was equitably estopped from challenging the parties' joint parenting agreement. Indeed, the wife not only had failed to raise a lack of standing but had "implicitly represented to the trial court [that the husband] had standing to petition for joint custody" (*Schlam*, 271 Ill. App. 3d at 796). Estoppel was based not on the wife's conduct in holding the husband out as the child's father, but on her conduct in representing to the trial court that joint custody was in the child's best interests, thus implicitly representing that the husband had standing to seek joint custody. Therefore, the husband reasonably relied on the agreement in anticipating that the parent-child relationship would continue. Because the wife's representations were made at the end of the parties' relationship and incorporated into the trial court's dissolution order, it was reasonable to believe that the wife's representations constituted her permanent intent,

-14-

barring a substantial change in circumstances. See 750 ILCS 5/610(b) (West 2010) (providing for modification of child custody judgment only on "clear and convincing evidence, \*\*\* that a change has occurred in the circumstances \*\*\* and that the modification is necessary to serve the best interest of the child").

¶ 46     In contrast, in the present case, the evidence supports the determination that Maria's conduct did not rise to such a level, as she never made any representation to the trial court of a father-daughter relationship. Instead, the representations about which Jim complains were made to family and friends, and perhaps Scarlett's school, while Jim and Maria were contemplating marriage. Maria's attempts to create a family, likely based on Jim's promise of marriage, could not reasonably induce Jim to believe that, absent that marriage, they would always remain a family. Unlike in *Schlam*, Maria made no representations regarding a continued relationship between Scarlett and Jim following the parties' separation. That Maria allowed Jim to see Scarlett for a few months following the separation is indicative of a gratuitous undertaking that she had the right to revoke. See *Engelkens*, 354 Ill. App. 3d at 798 (holding that the stepmother could not enforce her agreement with the biological father to allow her visitation, despite the stepmother's having included the child on her health insurance for years in reliance, because the agreement "was nothing more than a gratuitous undertaking"). Consequently, Maria did not misrepresent any material fact, and Jim cannot be said to have reasonably relied on Maria's conduct prior to the separation.

¶ 47     Nor are we persuaded that *Schlam* is inconsistent with *Mancine*. Notwithstanding Jim's assertion to the contrary, the court in *Mancine* did not reject equitable estoppel based on a requirement that the husband show fraud or intent to deceive. *Mancine* cited *Geddes*, a 2001 decision from our supreme court, which indicates that the first factor of equitable estoppel is a misrepresentation or concealment of a material fact. The *Mancine* court's conclusion that the wife was not equitably estopped from challenging the husband's standing reflected the fact that, as in the present case, she had not misrepresented any material fact. *Schlam* was based on different facts, where a misrepresentation of material fact was made.

¶ 48     Both Jim and the Illinois ACLU, in its *amicus* brief, cite a litany of out-of-state cases in support of the proposition that this court should recognize common-law standing for Jim's custody claim. Cases from our sister states are not binding on this court. See *Grafner v. Department of Employment Security*, 393 Ill. App. 3d 791, 801 (2009). Neither do we find them persuasive, because *Mancine* is apposite Illinois law and the out-of-state cases cited are not representative of Illinois law, which, as we discussed above, has never recognized common-law standing for an equitable parent to seek custody when the child is in the physical custody of a fit parent. Most of the cases cited are based on either a specific state statute granting standing to a nonparent petitioner or on well-established common law within that state. See, *e.g.*, *Mullins v. Picklesimer*, 317 S.W.3d 569 (Ky. 2010) (holding that the biological mother's former same-sex partner had standing to seek custody under a statute granting standing to a nonparent who has physical custody and was acting as a parent, even if the nonparent did so in a shared custody, coparenting situation); *C.E.W. v. D.E.W.*, 2004 ME 43, 845 A.2d 1146 (affirming the trial court's award of parental rights to the biological mother's former same-sex partner, where the mother conceded that the partner was the child's *de facto* parent under Maine's common law, and rejecting the mother's argument that

under relevant Maine statutory provisions a *de facto* parent's rights are limited to visitation only); *Latham v. Schwerdtfeger*, 802 N.W.2d 66 (Neb. 2011) (despite lack of statutory standing, biological mother's former same-sex partner had standing to seek custody and visitation under the doctrine of *in loco parentis*, which was well established in Nebraska's common law); *In re Clifford K.*, 619 S.E.2d 138 (W. Va. 2005) (following the biological mother's death, her same-sex partner was awarded custody as the psychological parent, over the maternal grandfather, under the "exceptional cases" provision of a West Virginia statute). But *cf. In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wis. 1995) (holding that biological mother's former same-sex partner lacked standing to seek custody, because she had not demonstrated the mother's unfitness or compelling circumstances requiring a custody change, but holding that, based on the courts' long-recognized equitable power, nonparent could establish standing to seek visitation if she demonstrated a parent-like relationship with the child and a significant triggering event justifying state intervention).

¶ 49   While we are not unsympathetic to Jim's position, or indeed, to Scarlett's situation (especially having read the *amicus* brief submitted by the Family Institute at Northwestern University, *et al.*), not only would it be inappropriate for us to ignore existing Illinois law, but our doing so would likely be fraught with unintended consequences. Legal change in this complex area of social significance must be the product of careful, extensive policy debate, sensitive not only to the evolving realities of nontraditional families and the needs of the persons within those families, not the least of whom are the children, but also to parents' fundamental liberty interest embodied in the superior rights doctrine and its restriction of the ability of the state to interfere in family matters. In short, the comprehensive legislative solution demanded here must be provided by our General Assembly.[7] See *C.B.L.*, 309 Ill. App. 3d at 895.

¶ 50   Jim further contends that the trial court's denial of his petition violates both his and Scarlett's federal and state constitutional rights. Specifically, Jim urges that his and Scarlett's substantive due process rights to "familial association and integrity" were violated and that Scarlett's right to equal protection was violated because she was penalized "because of her birth status or her parents' marital status, which are beyond her control." Our review of constitutional issues is *de novo. XLP Corp. v. County of Lake*, 359 Ill. App. 3d 239, 243 (2005).

¶ 51   To the extent that Jim raises constitutional claims on Scarlett's behalf, we must reject them. The caption on Jim's petition states, "Scarlett [Z.-D.], A Minor Child, by James R.[D.], individually, and as next friend on behalf of minor child Scarlett [Z.-D.], Petitioners." We note that a minor may not bring a suit in her own name. *Severs v. Country Mutual*

---

[7]One of the out-of-state cases that Jim and *amicus* cite is *In re Parentage of L.B.*, 122 P.3d 161 (Wash. 2005) (*en banc*), which involved a judicial solution. There, the Washington Supreme Court, in a matter of first impression, held that expanding its common law to recognize standing for *de facto* parents to seek custody was consistent with its existing common law, and that the Washington legislature, conspicuously silent on the matter, had not supplanted Washington's common law. The court adopted a *de facto* parentage test as delineated by the Wisconsin Supreme Court in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wis. 1995).

*Insurance Co.*, 89 Ill. 2d 515, 520 (1982); *Klak v. Skellion*, 317 Ill. App. 3d 1092, 1094-95 (2000). Although Jim filed a motion to be appointed next friend, the trial court denied it based on Jim's status as a party, which created a conflict of interest. Furthermore, "a party has standing to bring a constitutional challenge only if the party is able to show himself to be within the class aggrieved by the alleged unconstitutionality." *In re Marriage of Nienhouse*, 355 Ill. App. 3d 146, 153 (2004). Thus, Jim may not assert Scarlett's constitutional rights.

¶ 52　　Jim's argument regarding his due process rights as a parent begs the question, as we have made clear that Jim has not demonstrated that he is a parent under Illinois law. Jim's reliance on *Prince v. Massachusetts*, 321 U.S. 158 (1944), does not compel the conclusion that he has a constitutional right to parental status. In *Prince*, the child's aunt and legal guardian challenged the constitutionality of Massachusetts' child labor laws, under which she was convicted for sending the nine-year-old child to distribute Jehovah's Witnesses' literature. *Prince*, 321 U.S. at 159-61. She argued that the laws violated her right to freedom of religion and her due process rights as a parent. *Prince*, 321 U.S. at 164. The Court's analysis was about parental constitutional rights. *Prince*, 321 U.S. at 165-70. However, the Court was not called upon to address the aunt's standing as a parent, as the aunt had legal custody of the child. *Prince*, 321 U.S. at 161.

¶ 53　　Jim cites *Lehr v. Robertson*, 463 U.S. 248 (1983), for the proposition that the constitutional "interest in preserving the emotional attachments [children] develop with adult parent figures" "derives not necessarily from a blood relationship but from the role the parental adult plays in a child's life." In *Lehr*, the Court held that a biological father's constitutional rights were not violated by lack of notice as to his child's adoption by the biological mother's husband where the father had never had any significant relationship with the child. *Lehr*, 463 U.S. at 249-50. *Lehr* did not address the relationship between a child and an adult parent figure.

¶ 54　　Finally, Jim's reliance on *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976), in support of his contention that both parents and children have a fundamental right to create and maintain family relationships is not well taken. In *Danforth*, the Court addressed the constitutionality of Missouri's abortion statute. *Danforth*, 428 U.S. at 62-63. In holding unconstitutional the statute's requirement that a minor obtain parental consent before undergoing an abortion, the Court rejected the argument that the provision was justified by the state's interest in safeguarding the family unit. *Danforth*, 428 U.S. at 75. *Danforth* said nothing about a right to create or to maintain family relationships.

¶ 55　　In sum, as Jim concedes, he had no statutory standing to bring his claim for custody. Jim has provided, and our research has revealed, no apposite Illinois case law recognizing common-law standing to petition for same. Thus, assuming *arguendo* that the relevant statutes do not supplant the common law, there simply is no Illinois common law to support Jim's position. Accordingly, because Jim lacks standing under the Dissolution Act and the Parentage Act of 1984, we affirm the trial court's order denying count I of his petition.

¶ 56　　Jim also argues that the trial court erred in dismissing count II, seeking a determination of child support, because it was properly pleaded and not contingent on any statute or finding

of parentage. Under the trial court's order, Jim is not subject to paying child support. Jim's reliance on *M.J.* is misplaced. At best, under *M.J.*, Maria could bring a common-law claim for child support. However, that has not happened. Accordingly, Jim's argument is without merit.

¶ 57    Jim finally urges that the dismissal of counts III through VI was erroneous because they were properly pleaded and not contingent on a statute or a finding of parentage. Our review of a trial court's section 2-615 dismissal is *de novo*. *Rajterowski v. City of Sycamore*, 405 Ill. App. 3d 1086, 1092 (2010). Although counts III through VI all sounded in contract, the relief sought was custody, visitation, and child support determinations. See *Wabash County v. Illinois Municipal Retirement Fund*, 408 Ill. App. 3d 924, 932 (2011) (stating that the substance of a pleading is controlling, not its title). Accordingly, these claims are defeated by Jim's lack of standing, and we affirm the trial court's dismissal. See *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 300 (2005) (we can affirm dismissal for any basis supported by record, regardless of trial court's reasoning).

¶ 58    For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed. Given our disposition, our stay of the trial court's February 29, 2012, order vacating all previous orders for visitation and counseling is hereby lifted.

¶ 59    Affirmed.