(No. 92947.—

*In re* PARENTAGE OF M.J. *et al.*, Minors (Alexis Mitchell, Indiv. and as Guardian and Next Friend on Behalf of Minors M.J. and N.J., Appellant, v. Raymond Banary, Appellee).

*Opinion filed February 6, 2003.—Rehearing denied March 31, 2003.*

Enrico J. Mirabelli, of Chicago, for appellant.

Louis B. Garippo, of Glenview, and Frederic T. Knape, of Perkins Coie, L.L.C., of Chicago, for appellee.

Patricia M. Logue and Heather C. Sawyer, of Chicago, for *amicus curiae* Lambda Legal Defense and Education Fund, Inc.

JUSTICE KILBRIDE delivered the opinion of the court:

Appellant, Alexis Mitchell, brought this action against appellee, Raymond Banary, her former paramour, seeking to establish paternity and to impose support obligations for twin boys conceived through artificial insemination by an anonymous donor. The circuit court of Cook County dismissed Alexis' suit. The appellate court affirmed. 325 Ill. App. 3d 826. We allowed Alexis' petition for leave to appeal. 177 Ill. 2d R. 315. We also granted the Lambda Legal Defense and Education Fund, Inc., leave to submit an *amicus curiae* brief in support of Alexis. See 155 Ill. 2d R. 345. We now affirm in part, reverse in part, and hold that the Illinois Parentage Act does not bar common law claims for child support.

## I. BACKGROUND

We initially note that Raymond brought his motion to dismiss Alexis' complaint under section 2—619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2—619.1 (West 1998)). A motion to dismiss "admits all well-pled allegations in the complaint and reasonable inferences to be drawn from the facts." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 184 (1997). With that presumption in mind, we review the factual background of this case.

Alexis is a single woman who was 40 years old at the time of the filing of her complaint, and Raymond is a male who was 57 years old at the time of the filing of the complaint. Alexis and Raymond first met in 1986 and began an intimate relationship lasting 10 years. When they met, Raymond introduced himself to Alexis as "Jim Richardson" and told her that he was divorced.

During their 10-year relationship, the parties discussed marriage. Alexis and Raymond are of different races and, according to Alexis, Raymond told her that he would have to wait until retirement to marry because his community would not accept a mixed-race marriage. Raymond promised Alexis that upon his retirement, they would move to another community and be married.

The parties also discussed Alexis' desire to have children with Raymond. Despite their attempts to conceive, Alexis did not become pregnant, and it became apparent that Raymond could not father children. In 1991, Raymond suggested to Alexis that she become artificially inseminated by an anonymous donor as a means to have their child. Artificial insemination by a donor is also known as heterologous artificial insemination. Alexis claims that Raymond promised her that he would provide financial support for any child born by means of artificial insemination. However, Raymond's written consent to the procedure was never obtained. Alexis contends that Raymond orally consented to the procedure and that but for Raymond's promise to support the children, Alexis would not have completed the procedure.

According to Alexis, with Raymond's continuing consent and active encouragement, she attempted to become pregnant through artificial insemination. Raymond provided financial assistance for the insemination procedure; accompanied Alexis to the doctor's office for examinations; injected Alexis with medication designed

to enhance her fertility; and participated in selecting the donor so that the offspring would appear to be a product of their relationship.

On the fifth attempt, Alexis became pregnant and gave birth to twin boys in 1993. Raymond participated in selecting names for the children. After the births, Raymond acknowledged the children as his own. He also provided support for them in the form of monthly payments of cash and the purchase of food, clothing, furniture, toys, and play equipment. In her complaint, Alexis further describes many family vacations with Raymond to 10 different states and Mexico, and alleges that Raymond also paid for the children's medical, travel, and entertainment expenses.

In 1996, Alexis discovered that Raymond was not named Jim Richardson and that he was married. Upon discovering Raymond's true name and marital status, Alexis ended their relationship. Since 1996, Raymond has provided no financial support for the children.

Alexis filed a three-count complaint against Raymond seeking to establish paternity and impose a support obligation for the benefit of the twin boys. In the first two counts, Alexis sought to impose child support obligations by invoking common law theories of breach of an oral agreement and promissory estoppel. In the remaining count of her complaint, Alexis sought a declaration of paternity and establishment of child support pursuant to the Illinois Parentage Act (750 ILCS 40/1 *et seq.* (West 1998)).

Raymond filed a motion to dismiss, arguing that Alexis' common law claims, contained in counts I and II, were unenforceable under the provisions of the Frauds Act (740 ILCS 80/0.01 *et seq.* (West 1998)) and contravened Illinois public policy. Raymond also argued that all three counts should be dismissed pursuant to section 2—615 of the Code (735 ILCS 5/2—615 (West 1998))

because Alexis failed to set forth a legally recognized basis for the imposition of a father-child relationship or for child support under the Illinois Parentage Act (750 ILCS 40/1 *et seq.* (West 1998)).

The circuit court granted Raymond's motion and dismissed Alexis' complaint. The circuit court interpreted the Illinois Parentage Act as requiring that a husband consent in writing before he is treated in law as the natural father of a child conceived to his wife by means of artificial insemination. The circuit court commented that it would not be rational that unmarried couples would have fewer safeguards in such a matter. The circuit court therefore held that Alexis' common law theories were not actionable because the Illinois Parentage Act expressly requires written consent. The circuit court did not refer to the Frauds Act in its dismissal of the complaint.

Alexis appealed the circuit court's decision, and the appellate court majority determined that Alexis' common law theories for child support fail because the Illinois Parentage Act governs artificial insemination and requires that the "husband's consent must be in writing." The appellate court held that written consent is required before an unmarried man becomes legally obligated to support a child born as a result of artificial insemination. Based on its decision, the appellate court did not reach the issue concerning the Frauds Act.

## II. DISCUSSION

As previously noted, Raymond brought his motion to dismiss under section 2—619.1 of the Code (735 ILCS 5/2—619.1 (West 1998)). Section 2—619.1 permits a litigant to combine a section 2—615 (735 ILCS 5/2—615 (West 1998)) motion to dismiss and a section 2—619 (735 ILCS 5/2—619 (West 1998)) motion for involuntary dismissal into one pleading. 735 ILCS 5/2—619.1 (West 1998). A section 2—619 motion raises certain defects or

defenses and questions whether Raymond is entitled to judgment as a matter of law. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 494 (1994). A section 2—615 motion questions whether a complaint states a cause of action. *Illinois Graphics Co.*, 159 Ill. 2d at 488.

When ruling on a motion to dismiss under either section 2—615 (735 ILCS 5/2—615 (West 1998)) or section 2—619 (735 ILCS 5/2—619 (West 1998)) of the Code, the court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party. *Chicago Flood Litigation*, 176 Ill. 2d at 189. A motion to dismiss should be granted only if Alexis can prove no set of facts that would support a cause of action. *Chicago Flood Litigation*, 176 Ill. 2d at 189. We review both the dismissal of a complaint and the interpretation of a statute *de novo*. *Chicago Flood Litigation*, 176 Ill. 2d at 189; *People v. Robinson*, 172 Ill. 2d 452, 457 (1996).

In construing a statute, this court must give effect to the intent of the legislature. *Antunes v. Sookhakitch*, 146 Ill. 2d 477, 484 (1992). To ascertain legislative intent, we must examine the language of the entire statute and consider each part or section in connection with every other part or section. *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 318 (1989). Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999). With these principles in mind, we now turn to the interpretation of the Illinois Parentage Act.

In 1984, the General Assembly enacted the Illinois Parentage Act (750 ILCS 40/1 *et seq.* (West 1998)) "to define the legal relationships of a child born to a wife and husband requesting and consenting to \*\*\* artificial insemination." Pub. Act 83—1026, eff. January 5, 1984. Section 3 of the Illinois Parentage Act provides:

"(a) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated

artificially with semen donated by a man not her husband, the husband shall be treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing executed and acknowledged by both the husband and wife. The physician who is to perform the technique shall certify their signatures and the date of the insemination, and file the husband's consent in the medical record where it shall be kept confidential and held by the patient's physician. However, the physician's failure to do so shall not affect the legal relationship between father and child. All papers and records pertaining to the insemination, whether part of the permanent medical record held by the physician or not, are subject to inspection only upon an order of the court for good cause shown.

(b) The donor of the semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife shall be treated in law as if he were not the natural father of a child thereby conceived." 750 ILCS 40/3(a) (West 1998).

Any child born as a result of artificial insemination is considered the legitimate child of the husband and wife consenting to the use of the technique. 750 ILCS 40/2 (West 1998). Our interpretation of the express language of this provision of the statute indicates that the primary purpose of the Illinois Parentage Act is to provide a legal mechanism for a husband and wife to obtain donor sperm for use in artificial insemination and to ensure that a child is considered the legitimate child of the husband and wife requesting and consenting to the artificial technique.

Section 3(b) of the Illinois Parentage Act also provides a statutory vehicle for women to obtain semen for artificial insemination without fear that the donor may claim paternity. 750 ILCS 40/3(b) (West 1998). Additionally, section 3(b) protects sperm donors from claims of paternity and liability for child support.

The parties dispute whether, under section 3(a) of the Illinois Parentage Act, the failure to provide written

consent will preclude the establishment of a parent-child relationship and the imposition of a support obligation. This court has not conclusively interpreted the written-consent provision of the Act. We have, however, commented that the provision in the Act that "the husband's consent to the [artificial insemination] procedure 'must be in writing' *could be* considered a mandatory requirement for establishing a parent-child relationship pursuant to the statute." (Emphasis added.) *In re Marriage of Adams*, 133 Ill. 2d 437, 444 (1990), citing *Andrews v. Foxworthy*, 71 Ill. 2d 13, 21 (1978) (the word "must" is generally construed in a mandatory sense.)

Whether a statutory provision is deemed mandatory or merely directory depends upon the intent of its drafters. *People v. Youngbey*, 82 Ill. 2d 556, 562 (1980). An important aid in the determination of whether a provision is mandatory or directory is the form of the verb used in the statute. *Youngbey*, 82 Ill. 2d at 562. If the provision merely directs a manner of conduct, it is directory. *Andrews*, 71 Ill. 2d at 21. If the conduct is, however, prescribed in order to safeguard one's rights, the statute is mandatory. *Andrews*, 71 Ill. 2d at 21.

The first sentence of section 3(a) provides for the establishment of a parent-child relationship by consent. The second sentence of section 3(a) unequivocally requires that the consent for establishment of a parent-child relationship be in writing. This provision is clearly designed to safeguard rights concerning parentage. In light of the purpose of the written-consent requirement, we must conclude that the written-consent provision of section 3(a) of the Illinois Parentage Act is mandatory. Thus, section 3(a) of the Illinois Parentage Act mandates that written consent be obtained before parental responsibility may be established. Consequently, the failure to provide or obtain written consent will preclude a claim for paternity and child support under the Illinois Parent-

age Act. Accordingly, the appellate court did not err in affirming the circuit court's dismissal of count III of Alexis' complaint.

We note that the language of the Illinois Parentage Act was largely adopted from section 5 of the Uniform Parentage Act (UPA) (Unif. Parentage Act § 5, 9B U.L.A. 377 (1973)), as approved by the National Conference of Commissioners on Uniform State Laws. The commentary to section 5 of the UPA states:

> "This Act does not deal with the many complex and serious legal problems raised by the practice of artificial insemination. It was though [sic] useful, however, to single out and cover in this Act at least one fact situation that occurs frequently. Further consideration of other legal aspects of artificial insemination has been urged on the National Conference of Commissioners on Uniform State Laws and is recommended to state legislators." Unif. Parentage Act § 5, 9B U.L.A. 408, Comment (1973).

At the time the Illinois Parentage Act was enacted, the legislature intended to clarify the legal relationships among the parties involved in the artificial insemination procedure. See L. Smith, *The AID Child and In re Marriage of Adams: Ambiguities in the Illinois Parentage Act*, 21 Loy. U. Chi. L.J. 1173, 1192-93 (1990). However, as recognized by the commentary to section 5 of the UPA, the artificial insemination legislation "does not deal with the many complex and serious legal problems raised by the practice of artificial insemination." Unif. Parentage Act § 5, 9B U.L.A. 408, Comment (1973). Accordingly, the UPA comment urges that state legislators consider other legal aspects of artificial insemination.

In its current form, the Illinois Parentage Act fails to address the full spectrum of legal problems facing children born as a result of artificial insemination and other modern methods of assisted reproduction. The rapid evolution of assisted reproduction technology will continue to produce legal problems similar to those presented in this case. We urge the Illinois legislature to

enact laws that are responsive to these problems in order to safeguard the interests of children born as a result of assisted reproductive technology.

The need for reform to the Illinois Parentage Act is clear where, as here, we are compelled to apply the statute, in its current form, to a complex legal situation that the legislature did not anticipate when it passed the Illinois Parentage Act nearly 20 years ago.

Based on our determination that written consent is a prerequisite for invoking the protections of the Illinois Parentage Act, we need not and do not make any determination with regard to whether the Illinois Parentage Act applies to unmarried persons. Section 3(a) of the Illinois Parentage Act is simply not satisfied in this case because written consent was lacking.

Our determination that Alexis may not maintain an action under the Illinois Parentage Act does not end our inquiry. We must now determine whether the Illinois Parentage Act precludes common law claims for child support. Two Illinois appellate court cases have addressed this issue. These cases are *In re Marriage of Adams*, 174 Ill. App. 3d 595 (1988), *rev'd on other grounds*, 133 Ill. 2d 437 (1990), and *In re Marriage of Witbeck-Wildhagen*, 281 Ill. App. 3d 502 (1996). Each case reached a different result based on its unique facts.

In *Adams*, the appellate court held that the Illinois Parentage Act does not bar the imposition of a support obligation under an estoppel or waiver theory and that the failure to execute a written consent did not bar further inquiry into the circumstances surrounding the decision to use artificial insemination. *Adams*, 174 Ill. App. 3d at 610-11. The appellate court affirmed the trial court's finding that there was "actual consent" by the husband to the insemination procedure, who twice attempted to have his vasectomy reversed, had knowledge of and paid for tests and medical bills, accepted joint

responsibility for the child, and listed the child as a dependent on his federal income tax return. *Adams*, 174 Ill. App. 3d at 613-15. This court reversed and remanded the cause, on other grounds, holding that Florida law governed because the parties had resided in that state when the procedure was performed. *Adams*, 133 Ill. 2d at 448. We did not, however, reach the issue of whether a cause of action for child support could be maintained under common law theories.

In *Witbeck-Wildhagen*, 281 Ill. App. 3d 502, the husband made it clear that he did not consent to the procedure, and the wife acknowledged that he did not consent. Nonetheless, the wife petitioned to have the husband declared the legal father of her child and she sought child support. The appellate court upheld the trial court's finding that the husband did not consent to the insemination procedure since there was no evidence of the husband's consent, written or otherwise. *Witbeck-Wildhagen*, 281 Ill. App. 3d at 506-07. The appellate court specifically stated that it was not deciding whether the failure to obtain written consent would be an absolute bar to the establishment of the father-child relationship where the conduct of the father otherwise demonstrated his consent. *Witbeck-Wildhagen*, 281 Ill. App. 3d at 506-07. The appellate court recognized that this was not a case where the husband was "attempting to evade responsibility for his own actions in helping to conceive or encouraging the conception of a child." *Witbeck-Wildhagen*, 281 Ill. App. 3d at 507.

Although the appellate court reached opposite conclusions in *Adams* and *Witbeck-Wildhagen*, a finding of the existence or nonexistence of consent was based on an examination of the specific facts in each case.

In interpreting the Illinois Parentage Act, this court has specifically noted that "[i]t may be the case that a support obligation will be found even in the absence of a

parent-child relationship." *In re Marriage of Adams*, 133 Ill. 2d 437, 445 (1990). In *Adams*, this court recognized its duty, in an action where the interests of a minor are at stake, to ensure that the rights of the child are adequately protected. *Adams*, 133 Ill. 2d at 445, citing *Muscarello v. Peterson*, 20 Ill. 2d 548 (1960). We also suggested that estoppel might be available to prove consent. *Adams*, 133 Ill. 2d at 448.

Illinois has articulated its public policy recognizing the right of every child to the physical, mental, emotional, and monetary support of his or her parents. See 750 ILCS 45/1.1 (West 1998). Public policy considerations also seek to prevent children born as a result of assisted reproductive technology procedures from becoming public charges. See *Department of Public Aid ex rel. Cox v. Miller*, 146 Ill. 2d 399, 411-12 (1992) (concluding that the legislature intends to provide parental support for all minor children and commenting that "[l]egislative common sense dictates that if parents do not support their children, an already strained State welfare system must do so"). Illinois has a strong interest in protecting and promoting the welfare of its children. See *In re Marriage of Lappe*, 176 Ill. 2d 414, 431 (1997). We believe that, consistently with this important public policy, cases involving assisted reproduction must be decided based on the particular circumstances presented.

In considering the reach of the Illinois Parentage Act, we note that the statute contains only three sections: (1) the title section; (2) a section declaring that children conceived as a result of artificial insemination are deemed the same as the naturally conceived legitimate child of the husband and wife; and (3) a section concerning consent procedures of the "husband," and protections for and against the sperm donor. In interpreting a statute, courts should not add requirements or impose limitations that are inconsistent with the plain meaning

of the enactment. *Nottage v. Jeka*, 172 Ill. 2d 386, 392 (1996). Our examination of these three sections of the Illinois Parentage Act finds nothing to prohibit common law actions to establish parental responsibility, and the state's public policy considerations support a finding in favor of allowing common law actions. Moreover, this court has a duty to ensure that the rights of children are adequately protected. *Adams*, 133 Ill. 2d at 445.

We believe that if the legislature had intended to bar common law actions for child support, it would have clearly stated its intent, and we will not imply a legislative intent where none is expressed. See *Nottage*, 172 Ill. 2d at 395. We therefore determine that the best interests of children and society are served by recognizing that parental responsibility may be imposed based on conduct evincing actual consent to the artificial insemination procedure.

The courts of other states have reached similar results and have assigned parental responsibility based on conduct evincing consent to the artificial insemination. See *Gursky v. Gursky*, 39 Misc. 2d 1083, 242 N.Y.S.2d 406 (1963) (husband held liable for support of a child conceived by artificial insemination under either the basis of implied consent to support or the application of the doctrine of estoppel); *K.S. v. G.S.*, 182 N.J. Super. 102, 440 A.2d 64 (1981) (oral consent of husband was effective at the time pregnancy occurs unless established by clear and convincing evidence that consent has been revoked or rescinded); *In re Marriage of L.M.S.*, 105 Wis. 2d 118, 122-23, 312 N.W.2d 853, 855 (App. 1981) (sterile man who suggested to his wife that she become pregnant by another man and promised that he would acknowledge the child as his own has a legal obligation "to support the child for whose existence he is responsible"); *In re Baby Doe*, 291 S.C. 389, 353 S.E.2d 877 (1987) (husband's consent to artificial insemination may be express, or implied from conduct).

Here, Raymond's *alleged* conduct evinces a powerful case of actual consent. The allegations demonstrate a deliberate course of conduct with the precise goal of causing the birth of these children. In comparison, statutes and case law do not equivocate in imposing child support obligations for other children born out of wedlock. Moreover, a state may not discriminate against a child based on the marital status of the parties at the time of the child's birth. See *Miller*, 146 Ill. 2d at 405; *Gomez v. Perez*, 409 U.S. 535, 538, 35 L. Ed. 2d 56, 60, 93 S. Ct. 872, 875 (1973); *Mills v. Habluetzel*, 456 U.S. 91, 92, 71 L. Ed. 2d 770, 773, 102 S. Ct. 1549, 1551 (1982). Thus, if an unmarried man who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law. Regardless of the method of conception, a child is born in need of support. Under the alleged facts of this case, to hold otherwise would deprive the children of financial support merely because of deception and a technical oversight. Simply put, we cannot accept Raymond's argument that these children and their mother must be left to fend for themselves.

Claims of parentage and support of children produced as a result of assisted reproductive technologies are unique and must be decided based on the particular facts in each case. We hold that the Illinois Parentage Act does not preclude Alexis' claims based on common law theories of oral contract or promissory estoppel. Accordingly, the circuit court erred in dismissing counts I and II of Alexis' complaint on this basis, and the appellate court erred in affirming that order. We make no determination on the merits of Alexis' claims, or Raymond's affirmative defenses, including the Frauds Act, since these claims and defenses must be developed in the circuit court.

### III. CONCLUSION

Our holding is limited to the unique circumstances of this case. We do not address issues raised by the *amicus*, because these issues were not previously raised by the parties to this appeal. See *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 62 (2001).

For the foregoing reasons, we affirm that part of the appellate court judgment affirming the circuit court's dismissal of count III of Alexis' complaint, we reverse that part of the judgment of the appellate court affirming the dismissal of Alexis' claim for child support under counts I and II, and we remand the cause to the circuit court of Cook County for further proceedings not inconsistent with this opinion.

*Judgments affirmed in part and reversed in part; cause remanded.*