# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re T.P.S.*, 2012 IL App (5th) 120176

---

| | |
|---|---|
| Appellate Court Caption | *In re* T.P.S. and K.M.S., Minor Children (Catherine D.W., Petitioner-Appellant, v. Deanna C.S., Respondent-Appellee). |
| District & No. | Fifth District<br>Docket No. 5-12-0176 |
| Filed | October 9, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Petitioner's action seeking custody and other parental rights with respect to the children born to her former partner by artificial insemination based on contract, promissory estoppel and implied contract was improperly dismissed, since the best interests of children and society are served by recognizing that parental rights may be asserted based on conduct evincing actual consent to artificial insemination by an unmarried couple along with active participation by a nonbiological partner as a coparent. |
| Decision Under Review | Appeal from the Circuit Court of Williamson County, No. 12-F-2; the Hon. Brian D. Lewis, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

John Knight and Harvey Grossman, both of Roger Baldwin Foundation of ACLU, Inc., and David B. Goroff, of Foley & Lardner LLP, both of Chicago, for appellant.

Teresa Machicao-Hopkins, of Machicao & Associates, and Julie A. Thompson, both of Marion, for appellee.

Michael L. Brody and Tyler G. Johannes, both of Winston & Strawn, LLP, of Chicago, for *amicus curiae.*

Panel

JUSTICE STEWART delivered the judgment of the court, with opinion.

Justices Spomer and Wexstten concurred in the judgment and opinion.

## OPINION

¶ 1     The petitioner, Catherine D.W. (Cathy), and the respondent, Deanna C.S. (Dee), were involved in a long-term romantic relationship. During their relationship, the parties agreed that Dee would conceive two children by artificial insemination and that they would raise the children together as equal coparents. Two children were conceived by artificial insemination as a result of this agreement, T.P.S. and K.M.S. T.P.S. was born in January 2006, and K.M.S. was born in October 2008. In September 2009, Cathy and Dee's relationship ended, and Dee has prevented Cathy from visiting or communicating with the children since October 2010. Cathy filed a petition to establish parentage, custody, visitation, and child support with respect to the children. Dee moved to dismiss Cathy's petition, arguing that Cathy lacked standing to seek custody or visitation with the minor children because she is not a biological or adoptive parent. The trial court granted Dee's motion and entered a judgment dismissing Cathy's petition with prejudice. Cathy now appeals the circuit court's judgment. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings on Cathy's petition.

¶ 2                                   BACKGROUND

¶ 3     Initially, we note that the issue of Cathy's standing to seek custody and visitation is presented to us by way of the circuit court's dismissal of her petition pursuant to Dee's motion that was labeled as a motion brought under section 2-615 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2-615 (West 2010)). Cathy argues that a lack of standing is an affirmative matter that is properly raised only by filing a motion under section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2010)). Under section 2-615, a

-2-

complaint may be dismissed for a failure to state a cause of action because of factual or legal insufficiency. *In re Parentage of Scarlett Z.-D.*, 2012 IL App (2d) 120266, ¶ 19, 975 N.E.2d 755. A motion to dismiss pursuant to section 2-619(a)(9) of the Code admits the legal sufficiency of the complaint but asserts other affirmative matters that avoid or defeat the allegations contained in the complaint. *Id.*

¶ 4   In evaluating a circuit court's dismissal, we look at the substance of the motion to dismiss, not its label. See *Winters v. Wangler*, 386 Ill. App. 3d 788, 793, 898 N.E.2d 776, 780 (2008). In addition, in the present case, Cathy herself responded to Dee's motion by filing her own "affirmative matter" by way of affidavits and exhibits in support of her standing argument. Accordingly, Cathy was able to address the substance of the standing issue in response to Dee's motion and was not prejudiced by Dee's labeling of her motion. Therefore, we will review the substance of Dee's motion as one raising affirmative matter pursuant to section 2-619(a)(9) of the Code. Accordingly, our factual background is based on all well-pleaded facts contained in the pleadings, affidavits, and depositions found in the record, interpreted in the light most favorable to Cathy. *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 396, 917 N.E.2d 475, 477 (2009).

¶ 5   Cathy and Dee began their committed, romantic relationship in 2000. During their relationship, Cathy and Dee shared their income and family expenses, had a joint bank account, and jointly owned their home and other tangible property. Dee listed Cathy as her domestic partner when her employer offered domestic partner benefits. Dee also listed Cathy as the beneficiary for death benefits. They lived together and socialized with friends and family as a couple.

¶ 6   In 2004, they decided to expand their family by having children together through artificial insemination. They agreed that Dee would give birth to their children because she was the younger of the two and had health insurance through her employer. They also agreed that Cathy would be a full and equal coparent of any child born through artificial insemination. In addition, they agreed that Cathy would be the children's primary caregiver.

¶ 7   Once the parties agreed to expand their family through artificial insemination, Cathy was actively involved in each step of the planning for the children's births, including helping to arrange and pay for the artificial inseminations. Cathy attended prenatal appointments and maternity classes with Dee. Dee gave birth to two children as a result of artificial insemination: T.P.S., who was born in January 2006, and K.M.S., who was born in October 2008. Cathy was present and participated in the delivery of each child. After T.P.S.'s birth, the hospital gave Cathy an unofficial, honorary birth certificate that listed Cathy as Dee's "partner" and as one of T.P.S.'s parents. Many of Cathy's family members were present for T.P.S.'s birth, and Cathy and Dee jointly sent out birth announcements to family and friends.

¶ 8   At all times when Cathy and Dee were together, both prior to and after the children's births, Dee agreed that Cathy was to have legal parental rights to the children that were equal to hers. In addition, the parties agreed that Cathy would be the children's primary caregiver and would stay at home with the children. Prior to T.P.S.'s birth, Dee executed a will that directed Cathy to have sole responsibility for T.P.S. in the event of her death. Cathy and Dee also consulted with an attorney to discuss pursuing a second-parent adoption for Cathy. Their

attorney advised them that the circuit court in Williamson County would not grant a second-parent adoption to a same-sex, nonbiological parent. Instead, their attorney recommended the creation of a coguardianship as the quickest and surest means of securing Cathy's legal rights that were as close as possible to parental rights. Therefore, after the birth of each child, Cathy and Dee jointly petitioned the circuit court to make them equal coguardians.

¶ 9        The parties filed the joint petition for the coguardianship of T.P.S. approximately two months after his birth. They alleged that they both shared in his daily care and provided for his financial needs. The parties filed the joint petition for the coguardianship of K.M.S. approximately five months after her birth. They alleged that Cathy shared in the daily needs of the child and that K.M.S. had a close bond with Cathy. In both cases, the circuit court appointed a guardian *ad litem* (GAL), who supported the coguardianship as being in the children's best interests.

¶ 10       In the case concerning the coguardianship for T.P.S., the GAL reported that Cathy and Dee had been in a "lengthy relationship," that they had lived together for five years, and that they both cared for and loved the child. The GAL for K.M.S. reported that the two parties had been in a relationship for eight years and shared in the care of K.M.S. The GAL further noted that Cathy was "the primary care giver of K.M.S. during the week and the parties want to ensure that she will be able to access medical care for K.M.S. and that Cathy would have legal rights to continue caring for K.M.S. if something were to happen to Dee."

¶ 11       The circuit court granted the coguardianship in both cases, finding that it was in the best interests of the children.

¶ 12       After the birth of each child, Cathy fulfilled the role of primary caregiver to the children pursuant to the parties' agreement and provided love and emotional, psychological, financial, and educational support for each child. During the weekdays, Cathy stopped working at a video store that she owned in order to care for the children. Cathy was actively involved in every decision involving the children's care, including taking the primary responsibility for obtaining their medical care, overseeing T.P.S.'s attendance at preschool, attending parent-teacher conferences on his behalf, and arranging for the children's feeding, clothing, learning, and play. The children called Cathy "mom." Dee sent birthday cards and a Mother's Day card to Cathy from her and the children describing Cathy as "mom." Cathy's extended family was also the children's extended family, and they referred to Cathy's mother as their "Grandma Pat."

¶ 13       In September 2009, Dee ended her relationship with Cathy and moved out of their home. After Dee moved out, the children continued to stay with Cathy during the day, and they stayed with Cathy two or three nights per week. Cathy continued to buy the children food, clothing, medical supplies, toys, and other items. In July 2010, however, Dee petitioned the court in each guardianship case to end Cathy's coguardianship, and since October 2010, Dee has kept Cathy from seeing the children or having any communication with the children, including birthday or Christmas gifts for the children, and has prevented the children from having Cathy's physical, mental, emotional, and financial support.

¶ 14       Cathy objected to Dee's petitions to terminate the coguardianships, arguing that terminating the guardianships would not be in the children's best interests. In the

guardianship proceeding, the children's primary care physician, Dr. Sean McCain, attested in an affidavit to the bond that has formed between Cathy and the children. Dr. McCain stated in his affidavit that he believed that Cathy had always served as a mother to the children and that the children are attached to Cathy as their mother. Likewise, a nurse practitioner for the children, Stacy Gardner, stated in her affidavit that Cathy brought the children in for treatment of acute matters such as colds and sinus infections. She believed that Cathy was very nurturing and attentive toward the children and that the children considered Cathy to be their mother. In affidavits filed in the guardianship proceedings, several family friends also attested to Cathy's close relationship to the children as their mother.

¶ 15    The circuit court initially granted Dee's petitions to end Cathy's coguardianships without conducting an evidentiary hearing on Cathy's objections or considering the children's best interests, holding that Cathy lacked standing to challenge Dee's petition because she was not a biological or adoptive parent of the children. This court, however, reversed the circuit court's dismissal, holding that Cathy does have standing as a coguardian to oppose Dee's petitions. This court remanded the guardianship cases to the circuit court for a hearing on Dee's petitions and Cathy's objections. *In re T.P.S.*, 2011 IL App (5th) 100617, ¶ 19, 954 N.E.2d 673.

¶ 16    The issues raised in the guardianship proceedings are not before us in the present appeal. Instead, the issues in the present case concern a separate petition that Cathy filed on January 5, 2012, to establish her parentage, custody, visitation, and child support with respect to the two children. Cathy's standing to bring this petition is the central issue before us in the present appeal.

¶ 17    Cathy's petition alleged six different theories to establish her right to custody and visitation with the children. Count I alleged a right to custody and visitation under the common law, count II alleged a breach of an oral contract for custody and other parental rights, count III alleged a promissory estoppel theory, count IV alleged an implied contract, count V alleged a due process right of a parent under the United States Constitution, and count VI alleged a due process right of a parent under the Illinois Constitution.

¶ 18    Dee moved to dismiss Cathy's petition for parentage, custody, visitation, and child support, arguing that because Cathy was not an adoptive or natural parent of the children, she had no standing to seek custody or visitation under the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/601(b)(2) (West 2010)). The circuit court agreed and entered an order dismissing Cathy's petition. Cathy filed a timely notice of appeal.

¶ 19                                                    DISCUSSION

¶ 20    The central issue before us in this appeal concerns whether Illinois recognizes a common law action for child custody and visitation where an unmarried couple agrees to conceive a child by artificial insemination, and the couple subsequently begins raising the child as coequal parents. We hold that, with respect to children born of artificial insemination, under the facts of this case, the Illinois legislature has not barred common law contract and

promissory estoppel causes of action for custody and visitation brought by the nonbiological parent. Therefore, we reverse the circuit court's dismissal of counts II, III, and IV of Cathy's petition and remand for an evidentiary hearing concerning the best interests of T.P.S. and K.M.S. with respect to Cathy's request for custody and visitation.

¶ 21 In dismissing Cathy's common law claims, the circuit court ruled that there are only three ways in which a nonparent may seek custody of a child: section 601 of the Dissolution Act (750 ILCS 5/601 (West 2010)), the Juvenile Court Act of 1987 (705 ILCS 405/1-1 to 7-1 (West 2010)), or the Adoption Act (750 ILCS 50/0.01 to 24 (West 2010)). The circuit court focused on the standing requirements for a nonparent to seek custody under section 601 of the Dissolution Act, which provides as follows:

"(b) A child custody proceeding is commenced in the court:
***
(2) by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but only if he is not in the physical custody of one of his parents[.]" 750 ILCS 5/601(b)(2) (West 2010).

¶ 22 The circuit court ruled that because Cathy was a nonparent and did not meet the standing requirements under 601(b)(2) of the Dissolution Act, she did not have standing to seek custody or visitation of the minor children. We disagree with the circuit court's analysis.

¶ 23 Cathy does not argue that she has standing to seek custody or visitation under any of the provisions of the Dissolution Act or any other statutory provision. Accordingly, our analysis in the present case does not focus on the different scenarios under which various nonparents can establish standing to seek custody or visitation under the Dissolution Act or any other Illinois statutory provisions. Instead, our task is limited to determining the legislature's intent with respect to common law claims for parental rights in cases involving children born from artificial insemination and whether Cathy has adequately pleaded her common law claims. We believe that the supreme court's decision in *In re Parentage of M.J.*, 203 Ill. 2d 526, 787 N.E.2d 144 (2003), sets out the proper framework for our analysis of this issue.

¶ 24 In *M.J.*, the court addressed the issue of whether common law actions are allowed in Illinois for parental responsibility for the benefit of children born to unmarried couples through assisted reproduction. The court held that a man who participated in the decision and process to bring children into this world through artificial insemination can be required to financially support the children, under the common law, when he has no biological connection with the children and there is no statutory provision requiring him to do so.

¶ 25 In *M.J.*, the mother alleged that she and the respondent were together as an unmarried couple, that the respondent orally consented to her being artificially inseminated by semen from another man, and that he agreed to financially support any children that were born as a result of the artificial insemination. The mother had twins as a result of artificial insemination, but when she discovered that the respondent was married, she ended her relationship with him and filed a motion to establish his paternity and to impose a child support obligation. The mother alleged two counts under common law theories (oral contract and promissory estoppel) and one count under the Illinois Parentage Act (750 ILCS 40/1 to 3 (West 2010)). The circuit court dismissed all three counts of the mother's petition.

¶ 26 With respect to the claim of M.J.'s mother under the Illinois Parentage Act, section 2 of the statute states as follows: "Any child or children born as the result of heterologous artificial insemination shall be considered at law in all respects the same as a naturally conceived legitimate child of the husband and wife so requesting and consenting to the use of such technique." 750 ILCS 40/2 (West 2010). Section 3 of the Illinois Parentage Act states that when the husband consents in writing to the artificial insemination of his wife with semen donated by another man, "the husband shall be treated in law as if he were the natural father of a child thereby conceived." 750 ILCS 40/3(a) (West 2010).

¶ 27 In *M.J.*, the respondent did not sign a written consent to the artificial insemination of the mother. Therefore, the supreme court held that the Illinois Parentage Act could not be used to establish the respondent's parental obligation to pay child support. *M.J.*, 203 Ill. 2d at 535-36, 787 N.E.2d at 149. Accordingly, the court affirmed the circuit court's dismissal of the mother's claim under the Illinois Parentage Act.[1] *Id.* at 536, 787 N.E.2d at 149. The supreme court, however, reversed the circuit court's dismissal of the mother's common law claims against the respondent seeking to establish his parental responsibility. *Id.* at 541, 787 N.E.2d at 152.

¶ 28 In analyzing the circuit court's dismissal of the mother's common law claims, the *M.J.* court had to "determine whether the Illinois Parentage Act precludes common law claims for child support." *Id.* at 537, 787 N.E.2d at 150. The court concluded that it did not. In reaching this conclusion, the supreme court (1) considered the state's public policy with respect to minor children and (2) examined the three sections of the Illinois Parentage Act to determine whether the legislature intended to bar common law actions for support with respect to children born of artificial insemination. *Id.* at 540, 787 N.E.2d at 151-52.

¶ 29 In discussing Illinois's public policy with respect to minor children, the *M.J.* court first noted the duty of Illinois courts, "in an action where the interests of a minor are at stake, to ensure that the rights of the child are adequately protected." *Id.* at 539, 787 N.E.2d at 151. The court stated that the public policy in Illinois recognizes "the right of every child to the physical, mental, emotional, and monetary support of his or her parents" and that Illinois has a "strong interest in protecting and promoting the welfare of its children." *Id.* Consistent with this public policy, the supreme court specifically directed that cases involving "assisted reproduction" are to be decided based on the particular circumstances presented. *Id.*

¶ 30 The court then turned to the Illinois Parentage Act and noted that it contained only three sections. *Id.* The court concluded, "Our examination of these three sections of the Illinois Parentage Act finds nothing to prohibit common law actions to establish parental responsibility, and the state's public policy considerations support a finding in favor of allowing common law actions." *Id.* at 540, 787 N.E.2d at 151. The court emphasized its duty to ensure that the rights of children are adequately protected and believed that "if the legislature had intended to bar common law actions for child support, it would have clearly

---

[1]Because the respondent did not sign a written consent, the *M.J.* court did not need to address, and did not address, the issue of whether the Illinois Parentage Act would apply to nonmarried couples. *Id.* at 537, 787 N.E.2d at 150.

stated its intent." *Id.*, 787 N.E.2d at 152. "[T]he best interests of children and society are served by recognizing that parental responsibility may be imposed based on conduct evincing actual consent to the artificial insemination procedure." *Id.*

¶ 31    As further justification for its holding, the supreme court also noted that the respondent engaged in a "course of conduct with the precise goal of causing the birth of these children." *Id.* at 541, 787 N.E.2d at 152. The court reasoned that if an unmarried person "who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law." *Id.* The court, therefore, concluded that the Illinois Parentage Act does not preclude the mother's claims for parental responsibility based on common law theories of oral contract or promissory estoppel. *Id.*

¶ 32    The present case is similar to *M.J.* in that our task is to determine whether the legislature intended to bar a type of common law claim that is brought for the best interests of children born by assisted reproduction, but whose parentage falls outside the Illinois Parentage Act. We must determine whether the legislature intended that children conceived by artificial insemination, who fall outside the purview of the Illinois Parentage Act, are to be denied the physical, mental, and emotional support of the nonbiological parent who actively assisted in the decision and process of bringing them into this world. Under the analysis set forth in *M.J.*, we do not believe that the legislature intended this result. The legislature has not expressly stated that this is its intent in passing the Illinois Parentage Act, and we will not infer that this was the intent of the legislature on an issue that concerns the best interests of minor children.

¶ 33    Our analysis of this issue closely follows the analysis the Illinois Supreme Court set out in *M.J.* because the supreme court directed us to decide cases involving "assisted reproduction" based on the particular circumstances presented. Accordingly, we will first consider the state's public policy with respect to minor children, and we will next examine the three sections of the Illinois Parentage Act to determine whether the legislature intended to bar common law actions for custody and visitation with respect to children born of artificial insemination. *Id.* at 540, 787 N.E.2d at 151-52.

¶ 34    First, with respect to Illinois public policy, we note that the present case does not involve a dispute between two biological parents. However, *M.J.* concerned the respondent's parental responsibility when the respondent was not a biological parent. Nonetheless, the *M.J.* court directed us, in cases involving assisted reproduction, to be cognizant of Illinois's public policy recognizing "the right of every child to the physical, mental, emotional, and monetary support of his or her *parents*." (Emphasis added.) *Id.* at 539, 787 N.E.2d at 151. In addition, in assessing Illinois public policy with respect to children born from assisted reproduction, the *M.J.* court reminded us of our "duty, in an action where the interests of a minor are at stake, to ensure that the rights of the child are adequately protected" and that Illinois has a "strong interest in protecting and promoting the welfare of its children." *Id.*

¶ 35    Accordingly, by emphasizing the right of every child in Illinois to be supported by his or her "parents," the *M.J.* court indicated that this public policy applies to children born to a

couple by assisted reproduction even when only one of the couple is biologically related to the children. The court noted a child's right to be monetarily supported by his or her "parents" as part of its basis for allowing a common law cause of action for parental responsibility against the nonbiological partner of a couple having children by assisted reproduction technology.

¶ 36    Likewise, in the present case, this same public policy applies to T.P.S. and K.M.S. Similar to the twins in *M.J.*, T.P.S. and K.M.S. are also entitled to the physical, mental, emotional, and monetary support of both of their "parents," and this right to support is not limited to just monetary support, but also includes physical, mental, and emotional support. *Id.* Because Cathy participated in the decision and process of bringing T.P.S. and K.M.S. into this world through artificial insemination, *M.J.* establishes Cathy's common law obligation to financially support the children. Under the strong public policy language set forth in *M.J.*, we believe that Illinois's public policy recognizes the children's right not only to Cathy's monetary support but also to her physical, mental, and emotional support. Any other result would be a failure in our "duty" to ensure that T.P.S.'s and K.M.S.'s rights to "the physical, mental, emotional, and monetary support of [their] parents" are adequately protected. *Id.*

¶ 37    Second, as the supreme court did in *M.J.*, we next turn to the three sections of the Illinois Parentage Act to determine whether the Illinois Parentage Act precludes Cathy's common law claims. *Id.* at 537, 787 N.E.2d at 150. In this prong of the analysis, the *M.J.* court focused on the legislature's intent in passing the Illinois Parentage Act with respect to the financial support of children born by artificial insemination. We will also turn to the language of the Illinois Parentage Act to determine the legislature's intent with respect to the right of children conceived by artificial insemination to the physical, mental, and emotional support from the nonbiological person who participated in the decision and process of bringing them into this world.

¶ 38    The Illinois Parentage Act became effective on January 5, 1984, and as the supreme court noted in *M.J.*, it has only three sections. By its express terms, it applies to children born to a husband and wife by artificial insemination from donated semen when the husband signs a written consent to the artificial insemination. 750 ILCS 40/1 to 3 (West 2010). Under such circumstances, "the husband shall be treated in law as if he were the natural father of a child thereby conceived." 750 ILCS 40/3(a) (West 2010). After considering the three sections of the statute, the *M.J.* court found that it contained "nothing to prohibit common law actions to establish parental responsibility, and the state's public policy considerations support a finding in favor of allowing common law actions." *M.J.*, 203 Ill. 2d at 540, 787 N.E.2d at 151. The court stated, "We believe that if the legislature had intended to bar common law actions for child support, it would have clearly stated its intent, and we will not imply a legislative intent where none is expressed." *Id.* at 540, 787 N.E.2d at 152. "We therefore determine that the best interests of children and society are served by recognizing that parental responsibility may be imposed based on conduct evincing actual consent to the artificial insemination procedure." *Id.*

¶ 39    Likewise, in the present case, our review of the Illinois Parentage Act finds nothing in it that expressly prohibits common law actions, not only to establish the nonbiological parent's parental responsibility but also to establish the nonbiological parent's parental rights

with respect to children born by artificial insemination. Like the supreme court concluded in *M.J.*, we believe that had the legislature intended for children such as T.P.S. and K.M.S. to be denied their nonbiological parent's physical, mental, and emotional support, it would have done so expressly. Like the supreme court in *M.J.*, we are not going to infer such a legislative intent where none is expressed. Without an express legislative intent, we will not assume that the legislature intended for the children born to unmarried couples through the use of reproductive technology to have less security and protection than that given to children born to married couples whose parentage falls within the purview of the Illinois Parentage Act. While the current statutory framework does not expressly accommodate T.P.S.'s and K.M.S.'s parentage, we cannot believe that the legislature intended for these children to be denied the protections afforded by common law claims that are founded on their best interests.

¶ 40    Furthermore, in analyzing the legislature's intent with respect to barring common law claims, the supreme court has recently emphasized that common law "rights and remedies remain in full force in this state unless *expressly* repealed by the legislature or modified by court decision." (Emphasis added.) *Rush University Medical Center v. Sessions*, 2012 IL 112906, ¶ 16, ___ N.E.2d ___. "The implied repeal of the common law is not and has never been favored." *Id.* ¶ 17, ___ N.E.2d ___. "Thus, a statute that does not expressly abrogate the common law will be deemed to have done so only if that is what is 'necessarily implied from what is expressed.' " *Id.*, ___ N.E.2d ___ (quoting *Acme Fireworks Corp. v. Bibb*, 6 Ill. 2d 112, 119, 126 N.E.2d 688, 691 (1955)).

¶ 41    We therefore conclude, as the supreme court did in *M.J.*, that the best interests of children and society are served by recognizing that not only may parental responsibility be imposed but also *parental rights* may be asserted based on conduct evincing actual consent to the artificial insemination procedure by an unmarried couple along with active participation by the nonbiological partner as a coparent. To hold otherwise and to deny common law claims under such circumstances is to deny a child his or her right to the physical, mental, and emotional support of two parents merely because his or her parentage falls outside the terms of the Illinois Parentage Act. Because such a result is diametrically opposed to Illinois's public policy with respect to minor children, we will not assume that this was the legislature's intent in passing the Illinois Parentage Act.

¶ 42    Dee cites a number of cases from other appellate districts in Illinois that have held that the legislature has, by implication, preempted common law standing to seek parental rights, including *In re Visitation With C.B.L.*, 309 Ill. App. 3d 888, 723 N.E.2d 316 (1999), and *In re Marriage of Simmons*, 355 Ill. App. 3d 942, 825 N.E.2d 303 (2005). We do not believe that *C.B.L.* or *Simmons* reflects the proper analysis that is set forth by the supreme court in *M.J.*

¶ 43    In *C.B.L.*, the petitioner and the respondent lived together in a long-term relationship. During the relationship, the respondent was artificially inseminated and gave birth to a child. The petitioner was involved in all of the preparations prior to the birth and was equally involved in the child's care. When the parties ended their relationship, the biological mother refused the petitioner all contact with the child. The petitioner claimed standing to request visitation as a common law *de facto* parent or as an individual *in loco parentis*. The circuit

court, however, dismissed the petitioner's claims. *C.B.L.*, 309 Ill. App. 3d at 890, 723 N.E.2d at 318.

¶ 44 On appeal, the *C.B.L.* court held that the legislature intended to bar all common law actions for visitation when it enacted the visitation provisions contained in section 607 of the Dissolution Act (750 ILCS 5/607 (West 1998)).[2] The court stated, "Not only does it categorize those persons who may petition for visitation, but section 607 also qualifies each with numerous requirements and circumstances which must be met before such a petition will even merit consideration." *C.B.L.*, 309 Ill. App. 3d at 893-94, 723 N.E.2d at 320. The court concluded, therefore, that the visitation provision in the Dissolution Act "must now be understood and construed as a statutory provision intended by our General Assembly to supersede and supplant the common law of visitation in Illinois." *Id.* at 894, 723 N.E.2d at 320. The court affirmed the circuit court's dismissal of the petitioner's common law claims because she did not fit within the standing requirements of the Dissolution Act. *Id.* at 894-95, 723 N.E.2d at 320-21.

¶ 45 *C.B.L.* was decided prior to the Illinois Supreme Court's decision in *M.J.*, and we do not believe it reflects the proper analysis for cases involving "assisted reproduction," which must be decided based on the particular circumstances presented. *M.J.*, 203 Ill. 2d at 539, 787 N.E.2d at 151. In fact, the appellate court in *M.J.* cited *C.B.L.* for the proposition that "[t]he Illinois legislature, in establishing policy through statutory enactments, including the [Illinois Parentage] Act, has limited the circumstances under which a person can be determined to have parental rights and *responsibilities*." (Emphasis added.) *In re Parentage of M.J.*, 325 Ill. App. 3d 826, 834, 759 N.E.2d 121, 128 (2001). The supreme court in *M.J.*, however, disagreed with the appellate court's holding with respect to parental responsibilities and held that the legislature has not limited the circumstances under which a person can be determined to have parental responsibilities in cases involving artificial insemination. As noted above, we believe the *M.J.* court's analysis applies equally with respect to parental rights in cases involving artificial insemination, not just parental responsibility. Therefore, we do not find *C.B.L.* to be persuasive.

¶ 46 In *Simmons*, the petitioner and the respondent agreed to have a child by artificial insemination, and the respondent then gave birth to a child. At some point, the parties' relationship began to deteriorate, and the petitioner filed for divorce. At this point, the child was six years old. The circuit court denied the petitioner's request to dissolve their marriage but instead declared that the parties' marriage was void *ab initio*[3] and ruled that, because the petitioner was not a biological or adoptive parent, he did not have standing to seek custody

---

[2]Section 607 of the Dissolution Act provides for visitation for parents not granted custody as well as for grandparents, great-grandparents, and siblings. 750 ILCS 5/607 (West 2010). Subsection (a-5) of section 607 sets forth the conditions that must exist before a grandparent, great-grandparent, or sibling may file a petition for visitation. 750 ILCS 5/607(a-5) (West 2010).

[3]Because more surgeries were necessary to complete the petitioner's gender reassignment, the court held that the parties' marriage was a void same-sex marriage. *Simmons*, 355 Ill. App. 3d at 948, 825 N.E.2d at 308-09.

of the child. *Simmons*, 355 Ill. App. 3d at 946, 825 N.E.2d at 307.

¶ 47    On appeal, the court affirmed the circuit court's ruling that the parties' marriage was void *ab initio*. Nonetheless, the petitioner argued that, even if the marriage is invalid, he has standing to seek custody because he can still be considered a legal parent under the common law. *Id.* at 952, 825 N.E.2d at 312. The petitioner cited *M.J.* in support of his argument. The court, however, held that "[w]hile *M.J.* does stand for the proposition that an action can be brought under common law theories for financial support, it does not stand for the proposition that questions of paternity or custody may be brought under common law theories of breach of contract and promissory estoppel." *Id.* at 952-53, 825 N.E.2d at 312. The court cited *C.B.L.* in support of its conclusion that the petitioner's standing to seek custody "must be found solely within the Marriage Act, the Parentage Act, or the Parentage Act of 1984." *Id.* at 954, 825 N.E.2d at 313; see also *In re Adoption of A.W.*, 343 Ill. App. 3d 396, 404, 796 N.E.2d 729, 736 (2003) ("We agree with the holding in *C.B.L.* that, if standing for visitation is to be found, it is within the provisions of section 607 of the [Dissolution] Act.").

¶ 48    *Simmons* and *A.W.* are not persuasive. The courts in those cases improperly looked to the custody or visitation provisions of the Dissolution Act as a basis for declaring that the legislature has, by implication, barred common law actions for custody and visitation. In cases involving artificial insemination, *M.J.* establishes that such an analysis is improper.

¶ 49    For example, the *M.J.* court addressed the legislature's intent with respect to common law claims for support. We note that the legislature has passed extensive statutory provisions concerning the requirements that must be met before a person can be held responsible for monetary support of minor children. The legislature's enactments include detailed provisions in the Dissolution Act (750 ILCS 5/505 to 505.2 (West 2010)), in the Illinois Parentage Act of 1984[4] (750 ILCS 45/13.1, 14 (West 2010)), in the Non-Support Punishment Act (750 ILCS 16/20 (West 2010)), in the Uniform Interstate Family Support Act (750 ILCS 22/401 (West 2010)), and in the Illinois Public Aid Code (305 ILCS 5/10-1 to 10-28 (West 2010)). However, in analyzing whether the legislature has barred a common law cause of action for child support in cases involving artificial insemination, the *M.J.* court did not look at any of these provisions that specifically concern child support to determine the legislature's intent. Instead, the supreme court looked *only* at the provisions of the Illinois Parentage Act to determine the legislature's intent with respect to a very limited and specific category of children, *i.e.*, children conceived by artificial insemination.

¶ 50    Likewise, in the present case, we are concerned with whether the legislature has barred a common law cause of action relevant to parental rights with respect to this same category of children. Therefore, in determining whether the legislature intended to bar a common law cause of action, as the court did in *M.J.*, we will not turn to the language of the Dissolution

---

[4]The Illinois Parentage Act of 1984 (750 ILCS 45/1 to 28 (West 2010)) is not to be confused with the Illinois Parentage Act (750 ILCS 40/1 to 3 (West 2010)). The latter statute, three sections in length, is the only statutory provision that addresses the parentage of children born from artificial insemination.

Act, the Adoption Act, or the Juvenile Court Act of 1987. Instead, we turn only to the language of the Illinois Parentage Act because this is the only Illinois statute that concerns the parentage of children conceived by artificial insemination.

¶ 51    We believe that the *Simmons*, *A.W.*, and *C.B.L.* courts' focus on the provisions of the Dissolution Act and other statutory provisions other than the Illinois Parentage Act is misdirected and is directly contrary to the analysis set out by the supreme court in *M.J.* for cases dealing with assisted reproduction. *M.J.*, 203 Ill. 2d at 537, 787 N.E.2d at 150 ("We must now determine whether the Illinois Parentage Act precludes common law claims for child support."). In its analysis, the *M.J.* court looked only to the Illinois Parentage Act to determine whether the legislature had expressly barred common law actions for support in cases involving children born of artificial insemination.

¶ 52    Other cases cited by Dee in her attempt to distinguish the *M.J.* court's analysis are not cases concerning children born from assisted reproduction technology. Accordingly, they have little relevance to our analysis in the present case. For example, in *In re Marriage of Mancine*, 2012 IL App (1st) 111138, 965 N.E.2d 592, a husband sought custody of a minor child who had been adopted by the wife prior to the marriage. The court addressed the issue of "whether a nonbiological father has standing to seek custody of a child he intended to adopt but never formally adopted." *Id.* ¶ 11. The nonbiological father raised several theories to support his standing, including an equitable parent theory, equitable estoppel, equitable adoption, and the court's *parens patriae* power. However, unlike the present case, the *Mancine* court did not address the "particular circumstances" that cases involving "assisted reproduction" present. *M.J.*, 203 Ill. 2d at 539, 787 N.E.2d at 151. In fact, the *Mancine* court does not even cite *M.J.* in its analysis and does not attempt to distinguish it from cases involving adopted children, as opposed to children conceived through artificial insemination.

¶ 53    Likewise, *In re Parentage of Scarlett Z.-D.*, 2012 IL App (2d) 120266, is also distinguishable. Like *Mancine*, the petitioner in that case was the former boyfriend of the child's mother, and he sought to establish his parentage of the child who was adopted by his girlfriend during their relationship. The petitioner cited *M.J.* and argued that his common law standing to seek parental rights has not been supplanted by the standing requirements in the Dissolution Act. *Id.* ¶ 27. The *Scarlett Z.-D.* court distinguished *M.J.* by noting that the *M.J.* court limited its holding to only the " 'unique circumstances' presented there, including the purported father's financial support of twins born to his paramour as a result of artificial insemination to which he allegedly consented." *Id.* ¶ 30 (citing *M.J.*, 203 Ill. 2d at 530-31, 787 N.E.2d at 146). The *Scarlett Z.-D.* court further stated that *M.J.* addressed common law claims only for child support, not a common law claim for custody. *Id.* ¶ 30. The court believed that there was a vast difference between the Illinois Parentage Act, pertaining only to children born as a result of artificial insemination, and the wide scope of the Dissolution Act, addressing custody and visitation of both parents and nonparents. *Id.*

¶ 54    We offer no opinion on whether *Scarlett Z.-D.* was correctly decided with respect to a common law action for custody or visitation of adopted children. The facts of the present case do not involve adopted children similar to *Scarlett Z.-D.* Accordingly, with respect to standing to bring a common law action concerning children conceived by artificial insemination, we believe our analysis should follow the framework established by the

supreme court in *M.J.*, not by the appellate court in *Scarlett Z.-D.*

¶ 55    The *Scarlett Z.-D.* court further held that, even if the legislature did not intend to supplant the common law, there are no Illinois cases that would give the former boyfriend common law standing to pursue his claim for custody of the adopted child. In the present case, we believe that Cathy has alleged sufficient facts to seek custody and visitation under common law contract and promissory estoppel theories.

¶ 56    For example, in *In re M.M.D.*, 213 Ill. 2d 105, 820 N.E.2d 392 (2004), the maternal grandparents of a child and the child's father entered into a consent decree that granted the grandparents visitation with the child. The court stated that the consent decree was in the nature of a contract that was binding unless it was contrary to public policy. *Id.* at 114, 820 N.E.2d at 399. In evaluating whether the parties' agreement should be held void as being contrary to public policy, the *M.M.D.* court emphasized that Illinois courts "are reluctant to restrict the freedom of citizens to make their own agreements." *Id.* Therefore, Illinois courts sparingly use the power to declare agreements void as being contrary to public policy; the power is used only when an agreement is clearly against public policy (as established by the constitution, statutes, or decisions of the court) or manifestly injurious to the public welfare. *Id.*

¶ 57    In *M.M.D.*, the court held that the agreement to allow the grandparents visitation was not "injurious to the public welfare" because there was nothing in the record to suggest that the agreement "was anything but beneficial for everyone concerned at the time it was adopted." *Id.* at 115, 820 N.E.2d at 399. The grandparents "had cared for and nurtured the child for many years and had an obvious desire to maintain their relationship with her." *Id.* In addition, the court held that the agreement was not contrary to Illinois public policy as provided in the constitution, statutes, or decisions of Illinois courts. *Id.* Although the constitution prohibits the state from forcing fit parents to yield visitation rights to a child's grandparents when the parents do not wish to do so, "[t]here is no corresponding constitutional prohibition against a fit parent's decision to *voluntarily* bestow visitation privileges on his child's grandparents." (Emphasis in original.) *Id.*

¶ 58    Likewise, in *In re Marriage of Purcell*, 355 Ill. App. 3d 851, 825 N.E.2d 724 (2005), the husband was granted visitation privileges in a joint-parenting agreement incorporated into the terms of a consent decree. The husband was later determined not to be the father of one of the children. The court, nonetheless, held that the visitation agreement provided in the consent decree "should be enforced as a contract unless [the mother] can show a *contractual reason* for voiding or rescinding it." (Emphasis in original.) *Id.* at 856, 825 N.E.2d at 728. The court noted that a consent decree is based on an agreement between the parties, is contractual in nature, and records the parties' private agreement, but is not an adjudication of their rights. *Id.* at 855, 825 N.E.2d at 728.

¶ 59    In the present case, Cathy has pleaded facts sufficient to allege an agreement between her and Dee to conceive two children by artificial insemination and to raise the children with Cathy and Dee having coequal rights as parents. The lives of these children are derived directly from the express agreement between Cathy and Dee, as a couple, to expand their family by having children together through artificial insemination. Cathy alleged that Dee

was selected to give birth to the children only because she was the younger of the two and had health insurance through her employer. Cathy was engaged in the deliberate process of bringing two children into the world pursuant to an express agreement with Dee that each would have equal parental rights to the children.

¶ 60 Cathy agreed to serve as the children's primary caregiver, and at all times, Dee agreed that Cathy was to have legal parental rights that were equal to hers. Pursuant to this agreement, the children know both Cathy and Dee as their parents. Cathy assisted in arranging for and financially contributed to the artificial insemination and participated in the entire process, by agreement, as a coequal parent of the children. In *M.J.*, the court stated that if an unmarried person "who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law." *M.J.*, 203 Ill. 2d at 541, 787 N.E.2d at 152. The same is true with respect to parental rights. If an unmarried person causes the birth of a child by the deliberate, premeditated conduct of artificial insemination under the express agreement with the mother to serve as a coequal parent, that person should receive the same treatment in the eyes of the law as a person who biologically causes conception.

¶ 61 Enforcing this agreement between the parties under common law contract or promissory estoppel theories does not offend Illinois's public policy. There is nothing in the record to suggest that Cathy's physical, mental, and emotional support for the children would be anything but beneficial for the children. In addition, we do not believe that Cathy and Dee's agreement with respect to the birth, care, and parental rights of these children is contrary to any Illinois public policy as provided in the constitution, statutes, or decisions of Illinois courts. Although Dee is the only biological parent, there is no constitutional provision that prohibited Dee from voluntarily entering into a coparenting agreement with her partner for the specific purpose of creating a family through assisted reproduction technology and agreeing to coparent any children produced as a result of the agreement. Dee's *voluntary* agreement with Cathy concerning Cathy's rights as a coparent does not offend any constitutional provision. *In re M.M.D.*, 213 Ill. 2d at 114, 820 N.E.2d at 399.

¶ 62 As noted above, the supreme court has directed us, in assisted reproduction cases, to consider the particular circumstance each case presents. The particular circumstances that this case presents include allegations that the nonbiological parent (Cathy) actively planned for and participated in the very creation of the children at issue and cared for them as their parent for years after their birth. Under such circumstances, factors other than each party's DNA contribution to each child's creation have a greater significance. The intent and agreement of the parties in arranging and planning for the birth of the children, as well as Cathy's role, pursuant to the agreement, as the children's coparent and primary caretaker, have greater importance. In *M.J.*, the basis of the respondent's parental responsibility was not biology or genetics and was not based on any specific statutory provision. Instead, the respondent's parental responsibility was based on the respondent's role in the planning and arrangement of conceiving children through assisted reproduction. Likewise, in the present case, although Cathy is not biologically related to the children, she nonetheless was intimately involved in the planning and arrangement for the procreation of these children and

-15-

cared for them as a parent pursuant to an express agreement with the biological mother. Therefore, enforcing the parties' agreement under common law theories is not contrary to public policy.

¶ 63 Cathy has alleged sufficient common law contract and promissory estoppel claims to assert a right to custody and visitation with the children. The circuit court's order dismissing counts II, III, and IV of Cathy's claim is reversed. We remand for an evidentiary hearing on Cathy's common law contract and promissory estoppel claims and to determine the best interests of the minor children with respect to Cathy's custody and visitation.

¶ 64 In counts V and VI, Cathy alleged a due process right of a parent under the United States Constitution and a due process right of a parent under the Illinois Constitution. Cathy cites a number of cases involving the due process rights of parents and constitutional protection of the parent-child relationship. The foundation of Cathy's constitutional arguments is that her relationship with the children should be constitutionally protected under an equitable parent theory. Although we hold that Cathy has standing to bring common law contract and promissory estoppel claims under the analysis set forth in *M.J.*, we do not believe that Cathy has due process claims as an "equitable parent." There are no Illinois cases or statutes that adopt the equitable parent doctrine. *Mancine*, 2012 IL App (1st) 111138, ¶ 15. Accordingly, we must affirm the circuit court's dismissal of counts V and VI of her petition because her constitutional claims are couched in terms of equitable parentage.

¶ 65 Under this same reasoning, we affirm the circuit court's dismissal of count I of Cathy's petition alleging standing as a *de facto* parent and under a theory of *in loco parentis* to the children. Like the equitable parentage doctrine, we do not believe that Illinois common law recognizes these theories as a basis for custody or visitation. Cathy has not cited any Illinois cases that have granted custody or visitation based on any of these theories. Cathy cited *In re Ashley K.*, 212 Ill. App. 3d 849, 571 N.E.2d 905 (1991), in support of her *de facto* parent theory. In that case, however, the court was not called upon to address the issue of a nonparent's standing. *Scarlett Z.-D.*, 2012 IL App (2d) 120266, ¶ 36 (distinguishing *Ashley K.*).

¶ 66                                          CONCLUSION

¶ 67 For the foregoing reasons, we affirm the portion of the circuit court's judgment that dismisses counts I, V, and VI of Cathy's petition. We reverse the portion of the circuit court's judgment that dismisses counts II, III, and IV of Cathy's petition, and we remand this cause for further proceedings on those counts.

¶ 68 Affirmed in part and reversed in part; cause remanded.